**Corley K. WIGGINS, Plaintiff,**

v.

**Kenneth S. APFEL, Commission of Social Security, Defendant.**

### No. 98 C 2795.

United States District Court, N.D. Illinois, Eastern Division.

Dec. 10, 1998.

Barry Alan Schultz, Schultz & Winick, PC, Evanston, IL, for Corley Wiggins, plaintiff.

Matthew David Tanner, United States Attorney's Office, Chicago, IL, for Kenneth Apfel, defendant.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Corley Wiggins appeals the Social Security Administration's denial of his application for disability benefits. 42 U.S.C. § 405(g). In his application Wiggins claimed that a shoulder injury, his substance abuse disorder, and his mental status rendered him unable to sustain any gainful employment. The Administrative Law Judge concluded that none of his impairments met or equaled in severity those impairments presumed to result in disability under the Social Security Act, and that jobs exist in the local economy that Wiggins could perform. We vacate the Administration's denial of Wiggins' application because the ALJ improperly substituted his opinion for that of a medical expert and because substantial evidence does not support the ALJ's conclusion that jobs exist that Wiggins could perform and that Wiggins does not satisfy Listings 12.04 and 12.06.

## BACKGROUND

At issue in this case is Wiggins' claim to disability benefits based on his anxiety disorder and depression. Wiggins submitted medical records in support of his claim and appeared with his attorney before the ALJ for a hearing, during which he and a vocational expert testified. The ALJ denied Wiggins' application in a written opinion issued May 21, 1996. (R. at 13–24.) Wiggins asked the Appeals Council to review the ALJ's decision, but his petition was denied. He then filed this lawsuit.

## I. The Evidence Contained in the Administrative Record

In May 1996, Wiggins was forty-three years old. Wiggins did not finish the 10th grade and is limited in his ability to read, write, and perform simple math. He worked at Bradshaw–Praeger Company as a laborer and painter from 1979 to 1992. For part of that time, Wiggins supervised six employees. His physical duties at Bradshaw–Praeger required him to lift up to 100 pounds of ingredients used to make paint and shellac. Bradshaw–Praeger fired Wiggins because he was continually absent and late for work.

In 1993, Wiggins was injured and a friend died when they were both struck by lightening. According to Wiggins, this experience not only resulted in numbness in his left leg, but also severely traumatized him. He sought psychiatric assistance once for the resulting depression and anxiety, but did not return.

Dr. Mary K. Gardner, a psychologist, examined Wiggins in connection with his SSI application. Dr. Gardner administered an IQ test to Wiggins on which he scored a 69 full-scale IQ, a 69 verbal IQ, a 73 performance IQ, and eleven subtests with scores in the subaverage range. She reported that Wiggins was unable to answer simple numerical mathematical problems, scored below the second-grade level in both math and reading, and was unable to reliably recall four digits forward or three digits in reverse. Wiggins could not name four presidents of the United States; he reportedly told her that Martin Luther King was a president.

Dr. Gardner attribute Wiggins' low intellectual functioning to his volatile emotional state:

[A]fter he was seated, Mr. Wiggins immediately burst into tears and wept throughout the examination. His manner was very timid, fearful, and apprehensive. He stammered at times and was jumpy. Mr. Wiggins sometimes sat in silence for long periods of time. Twice during history taking he became severely disorganized and his eyes took on a wild and fearful look. This was most prominent when talking about his recently being hit by lightening. Mr. Wiggins gave the best effort he was

capable of, but memory and concentration appeared compromised. His extreme emotional reactivity also negatively impacted test scores. Test results are most likely low for this reason.

(R. at 174). She described Wiggins as manifesting significant motor tension, hypervigilance, and paranoid features throughout the examination.

On the basis of these observations and a battery of mental status tests,[1] Dr. Gardner diagnosed Wiggins as having an anxiety disorder and depression. (Tr. at 177.) She reported that Wiggins' exhibited symptoms of post-traumatic stress disorder related to being struck by lightening: thunder and lightening appeared to cause flash-back-like experiences; discussing the incident resulted in hysteria and extremely disorganized thought processes; and intrusive, repetitive thoughts centering on the trauma were pervasive.

Dr. Gardner also described Wiggins' depressive symptoms: profuse tearfulness, loneliness and feeling blue; feeling "slow in energy" and a marked loss of interest in sexual activity; suicidal ideation, but no intent or plan to commit suicide; and disruptions in his sleep and eating cycles. Dr. Gardner that Wiggins would be unable to sustain meaningful employment given the nature of his psychological problems. (R. at 178).

Wiggins also submitted a Psychiatric Review Technique form, (R. at 183–91), completed by Dr. Gardner. On that form, Dr. Gardner states that Wiggins' impairments meet Listings 12.04 and 12.06. (R. at 183.) Additionally, she rated Wiggins' impairments as resulting in a "marked" restriction of daily living activities, "extreme" difficulties in maintaining social functioning, and "frequent" deficiencies of concentration, persistence, or pace. (R. at 190.)

Wiggins was evaluated by three medical internists: Drs. Hilton Gordon, Mila Bacalla, and Facundo Dovale. Because this case does not involve a controversy over Wiggins' physical health, we set forth only the findings of these three doctors as they relate to Wiggins' mental health. Dr. Gordon reported that Wiggins' mental status was normal. He noted, however, that Wiggins had a reduced capacity of 10–20% in activities of daily living, social functioning, and concentration, persistence, and pace. (R. at 152.) Dr. Bacalla's only comment on Wiggins' mental health regarded his ability to manage his own money: "From observations of his mental status, [Wiggins] is capable of managing funds in his own interest." (Tr. at 158.) Neither Dr. Gordon nor Dr. Bacalla administered any psychiatric or intelligence tests, and based their opinions purely on observation.

Similarly, Dr. Dovale administered no IQ or psychiatric tests. But, when discussing Wiggins' mental status, Dr. Dovale reported that Wiggins "demonstrated very gross deficits." (R. at 164.) With "regard to [Wiggins'] intellectual functioning, he could not name five large cities or five large states. He did not know how many weeks there were in a year and he could not describe how many nickels there were in $1.15." (R. at 164.) Additionally, the doctor wrote that Wiggins was unable to recall the time of day, recite the correct date, or recall his birth date or year. Dr. Dovale noted that Wiggins "did not appear to be acutely intoxicated with alcohol" but could not ascertain "whether he might have ingested any other drugs." Dr. Dovale concluded that "this claimant is incapable of handling his own funds." (R. at 161–165).

Wiggins testified at the hearing. He said that he was unable to do certain tasks at home such as cooking, cleaning, and laundry. Although able to read the newspaper a "little bit", he does not, and he cannot write a money order. Wiggins' friend, Janice Peoples, assists him with the daily tasks he has difficulty performing. He spends his days watching TV and occasionally taking walks. He testified that he drinks "quite a bit" of wine and whiskey. When asked if he drinks a quart of the strong stuff, Wiggins responded "sometimes." He told Dr. Gardner that

---

1. Dr. Gardner administered 7 tests aimed at determining Wiggins' mental status: the WAIS–R, the WRAT–3, the Mental Status Checklist, the Bender Gestalt Test, Beck's Depression Inventory, Symptom Checklist 90–R (SCL–90–R), and the Rotter Incomplete Sentences test.

he drinks a pint of alcohol every other day. He also testified that he used drugs but stopped a year and a half before the hearing.

Finally, the record shows that Wiggins has poor eye sight: he has myopia, astigmatism, and presbyopia with vision of 20/100 in his right eye and 20/200 in his left eye. (R. at 150.) His vision is correctable. However, Wiggins testified that cannot afford eyeglasses. (R. at 50–51.)

At the hearing, a vocational expert ("VE") testified about whether Wiggins could perform a job available in significant numbers in the national economy. In response to a hypothetical presented by the ALJ, the VE testified that a 40 to 43 year old person, with a limited education, a lung problem, a left shoulder with 50% range of motion and 50% usage, and was limited to unskilled work requiring no more than five steps, could work as an office cleaner, a messenger, or an inspector. The VE testified that 20,500 jobs are available in the local area for that hypothetical person. When asked to include possible vision limitations in the scenario, the VE excluded the inspector's job, and further excluded the messenger job when mental impairments relating to being struck by lightning were added to the hypothetical. The VE also testified that "[i]f a person is moderately limited in understanding, memory, sustained concentration and persistence, social interaction, at a patient—in all those areas I would say that that would then preclude significant gainful activity on a sustained basis." (R. at 66).

## II. The ALJ's Decision

The ALJ determined that, for SSA purposes, Wiggins is not disabled. In reaching this conclusion, the ALJ performed the five-step analysis required by SSA regulations. The ALJ found that Wiggins retains the residual functional capacity ("RFC") to perform work in the light exertional category, but cannot perform close work, or more than five-step work routines, and must work in a clean environment. Assuming these limitations and considering Wiggins's age, educational background, and RFC, the ALJ determined that he is able to make a successful vocational adjustment to work which exists in significant numbers in the national economy. According to the ALJ, such work includes employment as an office cleaner, messenger, and small parts assembler. (R. at 13–23).

The ALJ found that Wiggins did not suffer from depression. He rejected Dr. Gardner's conclusions as being unsupported by the record. In discounting Dr. Gardner's conclusion that Wiggins was clinically depressed, the ALJ relied on evidence that Wiggins was overweight, well-nourished, and could follow the plots of several television shows. Additionally, the ALJ stated that Wiggins' sleep disturbances appeared to be caused by physical pain (as opposed to emotional pain).

The ALJ also rejected Dr. Gardner's anxiety disorder diagnosis. In discounting the physical symptoms of anxiety reported by Dr. Gardner, the ALJ stated that

> Mr. Wiggins also testified that he gets nervous and shakes when he cannot drink alcohol. It is difficult to determine, therefore, whether the symptoms Dr. Gardner observed were due to an actual anxiety disorder, symptoms of alcohol withdrawal, or given his red eyes, symptoms of the influence of drugs.

(R. at 18.) In a blanket statement rejecting both diagnoses, the ALJ concluded that

> [i]n light of the fact that the claimant has not sought any treatment whatsoever for his complaints of anxiety and depression, the many inconsistencies in the record regarding the claimant's mental status and the frequency and amount of his drug and alcohol consumption, as well as his failure to seek employment within his alleged limitations, the undersigned finds that the claimant's statements concerning his impairments and their impact on his ability to work are not entirely credible.

(R. at 13–23). Finally, the ALJ cited the reports of Drs. Gordon and Bacalla as evidence supporting his conclusion that Wiggins was neither clinically depressed nor suffering from an anxiety disorder.

The ALJ also found that whatever symptoms of depression or anxiety Wiggins did exhibit, the symptoms were not sufficiently severe to establish a disability under the Listings. He believed that Wiggins' mental

impairments caused "only slight restrictions" in carrying out daily living activities and "moderate" restrictions in maintaining social functioning. The ALJ determined that Wiggins would "often" have deficiencies in concentration, persistence, and pace, but only once decompensated in a work setting due to his mental impairments. (R. at 19.)

At step five, the ALJ determined that Wiggins retained the capacity to perform the exertional demands of work in the light exertional category that does not require close work or more than a five-step process. Based on the VE's testimony, the ALJ found that Wiggins could work as an office cleaner, a messenger, or a small parts assembler. Because these types of jobs are plentiful, the ALJ concluded that employment opportunities were available in significant numbers in the national economy that Wiggins could perform.

Wiggins filed this complaint for judicial review. He contends that the ALJ impermissibly substituted his opinion for that of Dr. Gardner and that the vocational expert's testimony does not support the ALJ's decision that there are jobs available in the economy that Wiggins can perform.

## LEGAL STANDARDS

The standard of review for an agency decision is deferential. *Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir.1993). In the absence of an error of law, this court will uphold the ALJ's findings of fact if supported by substantial evidence. *Griffith v. Callahan*, 138 F.3d 1150, 1152 (7th Cir.1998). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted).

To receive disability benefits, a claimant must be "disabled" as defined by the Social Security Act. An individual is disabled if he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 416(i).

Social Security regulations dictate the familiar five-step process for determining whether a claimant is disabled. *See, e.g.,*

*Pope v. Shalala*, 998 F.2d 473 (7th Cir.1993). At issue in this case are steps three and five. Step three requires the ALJ to determine if the claimant has an impairment that meets or exceeds any of the specific impairments that the SSA lists as so severe that they preclude substantial gainful activity. *See* 20 C.F.R. §§ 404.1520, 416.920. Step five requires the ALJ to determine if, considering age, education, and work experience, the claimant can perform work available in significant numbers in the national economy. § 404.1520.

## ANALYSIS

Wiggins presents two principle arguments supporting his claim for relief: (1) the ALJ's conclusion that his impairments did not meet the Listings is not supported by substantial evidence; and (2) the vocational expert's testimony does not support the ALJ's decision that there are jobs available in the national economy for Wiggins. As to the first claim, he argues that the ALJ impermissibly substituted his opinion for that of a medical expert, Dr. Gardner, and also that the ALJ erred by relying on the reports of Drs. Gordon and Bacalla to conclude that he does not have depression and an anxiety disorder.

### I. Whether the ALJ Improperly Discounted Dr. Gardner's Opinion that Wiggins was Clinically Depressed and Suffered from an Anxiety Disorder

Wiggins argues that substantial evidence does not support the ALJ's conclusion that his depression and anxiety disorder do not meet or equal in severity Listings 12.04 and 12.06. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Specifically, Wiggins contends that the ALJ improperly relied on the opinions of Drs. Gordon and Bacalla to discount Dr. Gardner's diagnoses, even though Dr. Gardner was the only mental health practitioner that examined him. Additionally, he asserts that the ALJ impermissibly substituted his own lay opinion of depression and anxiety for that of Dr. Gardner, a medical expert.

An ALJ's decision must be based on the testimony and medical evidence in the record. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir.1996). Substantial weight must be

afforded medical opinions, unless specific, legitimate reasons are shown for rejecting them; for instance, "[m]edical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence." *Knight v. Chater,* 55 F.3d 309, 313–14 (7th Cir.1995) (citing 20 C.F.R. § 404.1527(c)–(d)). But "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." *Rohan,* 98 F.3d at 970. If an ALJ indulges his layman's view of a disorder in lieu of an expert opinion, the ALJ's decision lacks evidentiary support and must be returned to the Administration for further proceedings. *Id.* at 971; *Wilder v. Chater,* 64 F.3d 335, 338 (7th Cir.1995) (An SSI claimant "is entitled to a decision based on the record rather than on a hunch.").

■ "Severe depression is not 'the blues.' It is a mental illness, and health professionals, in particular psychiatrists, not lawyers or judges, are the experts on it." *Wilder,* 64 F.3d at 337. Depression and other mental illnesses are diseases that require, just like any other disease, specialized training to evaluate and diagnose. *See Rohan,* 98 F.3d at 970; *Wilder,* 64 F.3d at 337. In fact, the *Wilder* court doubted the competence of medical internists to comment on or diagnose depression: "He [a general practitioner] is not looking for it [depression], and may not even be competent to diagnose it. . . . [D]octors who are not psychiatrists are slow to diagnose a mental illness, such as depression, that is not manifested in wild behavior." 64 F.3d at 337. The *Rohan* court explicitly warned ALJs against the impulse to substitute their lay view of depression for that of a medical expert (e.g., a psychiatrist or psychologist), by concluding "that the claimant's ability to do certain things (e.g. work . . .) [is] inconsistent with a diagnosis of depression."

98 F.3d at 970. Thus, ALJs may neither rely on their own lay view of a mental illness nor that of general medical practitioners to discount the opinion of a psychiatrist or psychologist that a claimant has that mental illness.

■ In this case, the ALJ failed to heed the Seventh Circuit's warnings by engaging in both types of improper usurpation of Dr. Gardner's professional opinion. First, the ALJ relied on the reports of two medical internists, Drs. Gordon and Bacalla (who examined Wiggins to determine the extent of his physical impairments and therefore did not express any opinion as to whether Wiggins was clinically depressed or had an anxiety disorder) to discount the diagnoses of a mental health expert, Dr. Gardner.

The ALJ then used his own opinions about what symptoms a depressed person ought to exhibit to decide that Wiggins was not clinically depressed. For example, the ALJ reasoned that Wiggins could not be depressed because he was "overweight for his height, was described as well nourished by examining physicians," and was "able to follow a variety of television programs throughout the day". (R. at 18.) Similarly, he made an independent evaluation of the evidence to determine that Wiggins was probably suffering from alcohol withdrawal, and not from an anxiety disorder.[2] Under *Rohan* and *Wilder,* the ALJ's reasons for concluding that Wilder was not clinically depressed and did not have an anxiety disorder were improper.

Even if the opinions of Drs. Gordon and Bacalla could be characterized as inconsistent with (as opposed to wholly irrelevant to) that of Dr. Gardner, an ALJ must consider a variety of factors when determining the weight to afford competing medical evidence.

**2.** The ALJ in this case commits errors virtually identical to those committed by the ALJs in *Rohan* and *Wilder. Compare Rohan,* 98 F.3d at 970 ("[The ALJ] independently evaluated the evidence in this case and improperly substitutes his judgment for that of Dr. Shapiro. Without expressly relying on any medical evidence or authority, the ALJ determined that Mr. Rohan's efforts at engaging in a small machine repair/retail business were incompatible with a diagnosis of major depression and Dr. Shapiro's conclusions regarding Rohan's functional abilities."); *Wilder,* 64 F.3d at 336 ("[The ALJ] pointed out that Wilder's medical records did not mention depression or other mental illness, that the records referred to her having 'retired' from her job as a security guard, [and] that she probably would not have been permitted to adopt a child had she been suffering from major depression. . . . The [ALJ] thought that Wilder has probably quit her job because she won [$2,000,000 in] the lottery rather than because she was disabled, though the psychiatrist had testified that the winning of the lottery, combined with adoption of the grandson, might have precipitated the major depression.").

These factors include whether a physician is a treating or examining physician; the length, nature, and extent of the treatment relationship; the physician's specialty; and the consistency and supportability of the physician's opinion. 20 C.F.R. §§ 404.1527(a)–(d), 416.927(a)–(d).

Drs. Gordon, Bacalla, and Dovale did not perform psychological examinations; instead, all three doctors performed physical examinations of Wiggins' shoulder with virtually no emphasis on his mental status. *Compare to Wilder,* 64 F.3d at 337 ("The medical records were of purely physical ailments for which Wilder had sought help, and there is no reason to expect a doctor asked about an eye problem, or back pain, or an infection of the urinary tract to diagnose depression."). In any event, to the extent that the three doctors appeared to examine Wiggins' mental abilities, it was to determine whether Wilder needed help managing his funds. Finally, as already discussed, the three specialize in internal medicine, not mental disorders.

Dr. Gardner, on the other hand, is a psychologist, a specialist in the field of mental health. She performed a full psychological examination of Wiggins and administered seven psychological tests; the purpose of her examination was to determine Wiggins' mental status.[3] Clearly, Dr. Gardner's opinion regarding Wiggins' mental impairments and their impact on his ability to sustain gainful employment deserve considerable weight. When viewed in light of the record as a whole, the so-called contradictory evidence is insubstantial and does not support the ALJ's conclusion that Wiggins' impairments do not meet or equal in severity Listings 12.04 and 12.06.

In sum, the ALJ's determination that Wiggins does not meet or equal Listings 12.04 and 12.06 is not supported by substantial record evidence. He improperly substituted his lay opinion of depression and anxiety symptomotology for that of Dr. Gardner, and inappropriately relied on the opinions of Drs.

Gordon and Bacalla to discount Dr. Gardner's diagnoses.

## II. The ALJ's Decision that there are Jobs Available in the Economy for Wiggins is not Supported by Substantial Evidence

Wiggins contends that the VE's testimony does not constitute substantial evidence of his ability to perform work in the economy because the hypothetical person posed by the ALJ did not accurately represent his functional limitations. Specifically, he asserts that the ALJ erred by omitting any reference to his visual impairment or his depression. Also, he claims the ALJ mischaracterized the functional limitations caused by his anxiety disorder. Wiggins maintains that, when asked about the vocational opportunities available to a hypothetical person mirroring his own abilities, the VE testified that no jobs exist in the economy that that hypothetical person could perform.

 The hypothetical question presented by an ALJ to a VE "must fully set forth the claimant's impairments to the extent that they are supported by the medical evidence in the record." *Herron v. Shalala,* 19 F.3d 329, 337 (7th Cir.1994). Of course, every detail of a claimant's impairments need not be included in the question, particularly if the record shows that the VE reviewed the medical record. *Cass v. Shalala,* 8 F.3d 552, 556 (7th Cir.1993). But, if the medical evidence establishes that a claimant has specific impairments, those impairments must be presented to the VE or his opinion will not constitute substantial evidence.

 The record establishes that the ALJ improperly omitted reference to Wiggins' depression from the hypothetical. Furthermore, we agree with Wiggins' assertion that the ALJ mischaracterized the limitations resulting from his anxiety disorder. The only reference to psychological limitations presented by the ALJ to the VE is as follows:

[T]here does seem to be some mental problem since, since the episode where,

---

**3.** The final two factors, whether the "competing" doctors are consulting or treating physicians and the extent of the treating relationship, do not weigh in favor of any of the medical opinions at issue here. All three doctors were consultants for Wiggins' disability benefits application, and none of the doctors had a "treating relationship" with Wiggins.

where his friend was killed by lightening and he was—had the injury. It seems to make him nervous, afraid of loud noises or sudden things. So I would ask you to assume that he's limited to a routine unchanging work place not subject to upsetting things such as loud, loud noises, crowds, pressure, people, things of that sort.

(R. at 62). The ALJ's description of the consequences of Wiggins' anxiety disorder—being "afraid of loud noises and sudden things"—grossly understates how disruptive Dr. Gardner found his symptoms. In her report, she states that he has flashback-like symptoms, becomes hysterical, and has repetitive intrusive thoughts as a result being struck by lightening. More generally, she reported that Wiggins is afraid of people, paranoid, and hypervigilant; that he trembles and exhibits significant motor tension as a result of autonomic hyperactivity; and that he has perceptual difficulties. That someone experiencing these symptoms could work as a messenger or an office cleaner seems incredible.

Moreover, on the Mental Residual Functional Capacity Assessment completed by Dr. Gardner—the only record evidence regarding Wiggins' functional limitations resulting from his mental impairments—she declared that Wiggins was either moderately or markedly limited all of the subcategories of understanding and memory; sustained concentration and persistence; social interaction; and adaptation. (R. at 192–93.) The VE testified that a person only moderately limited in all of these areas would be precluded from engaging in significant gainful activities. (R. at 66.)

The ALJ failed to set forth all of Wiggins' impairments in his hypothetical to the VE; an error which in and of itself demonstrates a lack of substantial evidence supporting the ALJ's conclusion that Wiggins could work as a messenger or office cleaner. Additionally, when Wiggins' attorney rectified the ALJ's omission, the VE testified that a person with limitations similar to Wiggins' could not sustain any gainful activity. This Court concludes, therefore, that the ALJ's determination at step five was not supported by substantial record evidence.

 Finally, we reject Wiggins' claim that the ALJ improperly refused to consider his uncorrected (and, according to the VE, disabling) vision at step five. Although, it is true that poverty excuses a claimant's failure to correct a treatable impairment, *see, e.g., DeFrancesco v. Bowen,* 867 F.2d 1040, 1044 (7th Cir.1989); *Dawkins v. Bowen,* 848 F.2d 1211, 1213–14 (11th Cir.1988), Wiggins has not met his burden of proof that his poverty is so severe that a simple pair of eyeglasses is beyond his means, or that his visual impairment is such that the expense of correcting it would be prohibitive. Wiggins must do something more than merely plead poverty at the hearing. On this record, the ALJ reasonably concluded that Wiggins' poor eyesight was correctable and, therefore, properly found that this impairments limited only Wiggins' ability to do close work (as opposed to all work).

## REMEDY

Wiggins, citing *Taylor v. Chater,* 118 F.3d 1274 (8th Cir.1997), contends that the appropriate relief for the ALJ's errors is an order directing the Administration to grant Wiggins disability benefits. We disagree. In both *Rohan* and *Wilder*—cases in which the ALJs committed errors almost identical to those committed by the ALJ in this case—the Seventh Circuit ordered the case remanded to the SSA for further proceedings, including taking additional evidence. *See Rohan,* 98 F.3d at 971; *Wilder,* 64 F.3d at 338. This Court is governed by *Rohan* and *Wilder.* We believe, therefore, that the appropriate exercise of our discretion is to vacate the denial of disability benefits to Wiggins and remand the case for further proceedings consistent with this opinion.

## CONCLUSION

For the reasons stated above, Wiggins' motion for summary judgment (12–1) is granted. The decision denying disability benefits to Wiggins is vacated and the case is remanded to the Social Security Administration for further proceedings in accordance with this opinion. The Clerk of the Court is

instructed, pursuant to Federal Rule of Civil Procedure, to enter judgment in favor of Wiggins and against the defendant. This is a "sentence four" remand and hence a final order under *Melkonyan v. Sullivan*, 501 U.S. 89, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991).