KATHLEEN COOK, Plaintiff, Appellee,

v.

**LIBERTY LIFE ASSURANCE COMPANY OF BOSTON,** Defendant, Appellant.

No. 02–1656.

United States Court of Appeals, First Circuit.

Heard Oct. 7, 2002.

Decided Feb. 5, 2003.

Before BOUDIN, Chief Judge, TORRUELLA and LIPEZ, Circuit Judges.

LIPEZ, Circuit Judge.

Liberty Life Assurance Company ("Liberty") appeals from the district court's entry of summary judgment for Kathleen Cook, a former participant in one of its long-term disability insurance plans governed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.* (2002). Cook had been receiving disability benefits for more than three years when Liberty terminated her benefits on the ground that she no longer met the plan's definition of "disabled." The district court found that Liberty's decision was "arbitrary and capricious." Agreeing with that conclusion, we affirm the court's grant of summary judgment to Cook. We also affirm the district court's award of back benefits and accompanying relief, finding that such an award was within its discretion.

## I.

### A. Cook's Illness and Her Eligibility for Benefits

Kathleen Cook had been employed with Lockheed Sanders, Inc. ("Sanders") since 1983. Sanders provides its employees with short and long-term disability benefits under policies provided and administered by Liberty. Cook filed a claim for short-term disability benefits in February 1995, having been out of work since November 1994 with symptoms of Chronic Fatigue Syndrome ("CFS"), as diagnosed by her treating physician, Dr. W. Stewart Blackwood.[1] Dr. Blackwood's notes from that period report that Cook was complaining of fatigue, loss of appetite, a constant cough, and depression. Diagnostic

William D. Pandolph, with whom Sulloway & Hollis, P.L.L.C. was on brief for appellant.

Glenn R. Milner, with whom Cook & Molan, P.A. was on brief for appellee.

---

1. See the Appendix for a chronology of important dates and events in this case.

tests revealed an elevated level of the Epstein Barr virus. As recorded in the Physician's Statement of Disability accompanying Cook's claim, Dr. Blackwood stated that he was seeing Cook on a monthly basis, that she was totally disabled from both her regular occupation and any other occupation, and that he did not know when she would be able to return to work.

After her short-term benefits expired in April 1995, Cook filed another claim with Liberty for benefits under the long-term disability policy. At this point, she was still unable to return to work. Attached to her claim form was a note from Dr. Blackwood. He stated that her diagnosis continued to be CFS; her symptoms were "severe fatigue, cough, nasal congestion, malaise, a[s]thma, sleep disturbance and depression"; and her treatment plan included homeopathic medications, vitamin supplements, acupuncture, continued counseling and Zoloft. He classified her physical capacity as "severe[ly] limited: incapable of minimum activity." Liberty approved Cook's claim on May 8, 1995.

Under the terms of Liberty's long-term disability benefits policy, a claimant must be "disabled" and require the regular attendance of a physician in order to be eligible for benefits. "Disabled" is defined by the policy:

1. "Disability" or "Disabled" means during the Elimination Period and the next 24 months of Disability the Covered Person is unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness; and

2. After 24 months of benefits have been paid, the Covered Person is unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity.

These definitions of disability are referred to throughout this litigation as the "own occupation" (first 24 months) and "any occupation" (after 24 months has expired) definitions of disability. Liberty paid Cook long-term disability benefits from April 1995 to April 1997 because it found she met the "own occupation" definition of "disabled." In March 1997, as her first 24 months of benefits came to an end, Liberty informed Cook that it would be reviewing the status of her disability to determine whether she met the "any occupation" definition of "disabled." In April of that year, Dr. Blackwood returned a Physical Capacities Form to Liberty in which he reported that Cook was still suffering from CFS, but that her only limitations were "to avoid getting over-tired or working in excess of 40 hours a week." Around the same time, Dr. Blackwood issued Cook a medical certificate[2] saying she could return to work on April 14, 1997, on a "trial basis," so long as she was working no more than 40 hours per week and could take regular breaks.[3] The administrative record indicates that Cook presented this certificate to Sanders,

2. This document is a pre-printed form entitled "medical certificate" provided by the medical center with which Dr. Blackwood is affiliated. In this case, Dr. Blackwood used this form to communicate with Sanders regarding Cook's work limitations. The form has lines to fill in the patient's name, diagnosis, expected return to work or school date, and limitations. This medical certificate—listing Cook's return to work date as April 14, 1997, and permitting her to work 40 hours a week—is the first of three medical certificates that are involved in this case.

3. Cook had previously reported that Sanders required her to work 50–60 hours each week and oftentimes she was unable to take lunch or dinner breaks.

which forwarded it to Liberty. Cook returned to work on that day and Liberty temporarily suspended her benefits.

Her return to work was brief. On May 5, 1997, Dr. Blackwood pulled Cook out of work again after she had a severe reaction to an infected tooth. Her medical records indicate that she complained about muscle aches and difficulty with sleeping. Also, she told Dr. Blackwood that she was feeling stress because she could not complete the work Sanders had assigned her without working more than 40 hours per week. The combination of her infection and the stress she experienced during her return to work led Dr. Blackwood to conclude that she had suffered a recurrence of CFS. His chart notes from that day also reflect his decision to "put her back out of work on an indefinite basis, noting that the note we gave her previously was for a trial return to work." On May 9, 1997, Liberty renewed Cook's disability benefits and updated her status to "approved" under the "any occupation" definition of "disabled."

Between May 1997 and July 1998, Cook remained out of work and regularly saw Dr. Blackwood. In December 1997 and August 1998, she and Dr. Blackwood responded to Liberty's requests for updated medical information, and Liberty continued to pay her disability benefits. The most recent set of Cook's medical records included in the administrative record reveals that in June 1998, Cook reported that her fatigue had recently worsened and she was suffering generalized aches and pains, but that she was not experiencing any stress. Dr. Blackwood renewed his diagnoses of asthma, CFS, and fibromyalgia.[4]

During this time, Liberty learned that Cook had been working part-time with a real estate agency. When asked about it, Cook told the analyst handling her claim that she had worked two Sundays showing houses for the agency. Liberty wrote to the agency asking for Cook's work and earnings history. They responded that her duties included "occasional open houses, showings, [and] customer phone calls," and that she had earned $175.02 between April and July of 1997. Liberty informed Cook that her long-term disability benefits would be offset by the amount of money she was earning from her part-time job, but if she earned less than 20 percent of her pre-disability salary, there would be no offset.

**B. The Termination of Cook's Benefits**

In late July 1998, a Liberty analyst conducting a regular review of Cook's file wrote to Dr. Blackwood asking for Cook's updated medical information. In August, Dr. Blackwood returned to Liberty copies of Cook's chart notes from October 1996 to June 1998 along with a medical certificate dated March 24, 1997, and signed by Dr. Blackwood. This certificate stated that Cook could work no more than 40 hours per week and needed to have regular breaks. After receiving this information, Liberty wrote to Dr. Blackwood on August 18, 1998, and asked whether the restrictions and limitations listed in the March 24, 1997, certificate were still applicable to Cook. Liberty attached the certificate in question to the letter it sent to Dr. Blackwood. Dr. Blackwood responded by sending back the letter with the word "Yes" written on it and circled. As later became clear, Dr. Blackwood had misunderstood the medical certificate at issue. He

4. Fibromyalgia is a disorder characterized by widespread musculoskeletal pain, fatigue and multiple tender points. National Institutes of Health, *Questions and Answers About Fibro-* *myalgia, at* http://www.niams.nih.gov/hi/topics/fibromyalgia/fibrofs.htm (December 1999). Dr. Blackwood had first diagnosed the disease in May 1996.

thought he was saying "Yes" to a medical certificate he had issued on May 5, 1997, which stated that Cook was "out of work indefinitely." The conclusion listed on this medical certificate was also recorded in Cook's chart notes from May 5, 1997, a copy of which had been presented to Liberty the last time it had reviewed Cook's claim in December 1997.

Shortly after receiving Dr. Blackwood's response, Liberty forwarded Cook's file to Carol S. Vroman, a Vocational and Rehabilitation Consultant. Reviewing Cook's work restrictions and limitations as listed in the March 24, 1997, medical certificate, and taking into consideration her education and work history, Vroman concluded that Cook was "not disabled from either her own or any other occupation." On October 16, 1998, Liberty informed Cook that she was no longer eligible for long-term disability benefits. The denial letter explained the contents of the March 1997 medical certificate Dr. Blackwood had provided Liberty and the fact that he had affirmed that those restrictions and limitations were still applicable. It then stated that "[a] vocational assessment dated October 14, 1998 reveals that there are many employment options available to you based on her [sic] education with an MBA and your restrictions and limitations.... Since you have the ability to perform occupations outside your previous position, you do not meet Lockheed Sander's [sic] definition of disability beyond October 31, 1998."

■ Cook responded to this letter by asking Liberty to review its decision to terminate her eligibility. She forwarded to Liberty letters written by Dr. Blackwood stating that she was totally disabled due to stress, fatigue, and "severe, chronic asthma." Dr. Blackwood explained to Liberty that "he mistakenly thought your letter was referring to my disability form completed on May 5, 1997 which indicated that she was out of work indefinitely." He attached this "disability form" (medical certificate) to his letters. Cook also attached a letter Dr. Blackwood had written on March 23, 1998, to the attorney handling Cook's claim for Social Security Disability benefits.[5] This letter stated that Cook "fit[ ] the diagnostic criteria for chronic fatigue syndrome," and concluded "[t]he fatigue she feels after doing any normal daily activities makes it difficult to see how she could maintain a regular job, as she would have to be out of work intermittently to recover."

Liberty added this information to its file but affirmed its termination of benefits on April 12, 1999. It explained its reasoning in another letter:

> We have reviewed the additional medical information submitted by Dr. Blackwood. The medical information submitted does not support limitations that would render you incapable of performing the material and substantial duties of any occupation.
>
> A Vocational Disability Review was performed taking into consideration your limitations, education and experience.

5. Liberty had encouraged Cook to apply for Social Security Disability benefits, and informed her that any award would offset the benefits the long-term disability plan was paying her every month. Liberty referred her to a law firm that specialized in such claims and told Cook it would pay the costs of hiring this firm to secure her benefits. The firm regularly apprised Liberty of the state of Cook's social security case. On August 9, 1998, the Social Security Administration approved Cook's claim for benefits. However, we recognize that "benefits eligibility determinations by the Social Security Administration are not binding on disability insurers." *Pari–Fasano v. ITT Hartford Life & Accident Ins. Co.*, 230 F.3d 415, 420 (1st Cir.2000).

Several occupations were identified and communicated to you in our letter of December 1, 1998, which is enclosed for your review. . . .

Based on the above cited information, and in the absence of objective medical documentation to substantiate total disability from any occupation, no further. Long Term disability benefits are payable.

Cook then hired counsel and again requested review of her termination. On May 22, 2000, Liberty apparently refused to reconsider Cook's arguments, responding: "Ms. Cook was afforded an opportunity to appeal the initial denial of benefits under ERISA guidelines. Liberty reviewed this appeal and have rendered [sic] our final determination on Ms. Cook's claim for benefits beyond October 31, 1998."

## C. Cook's Lawsuit

Cook brought suit against Liberty in Hillsborough County (New Hampshire) Superior Court, alleging state law violations and breach of contract claims arising from Liberty's termination of Cook's benefits. Liberty removed the action to the federal district court of New Hampshire on the ground that Cook's state law claims were preempted by ERISA, and Cook agreed that the court should construe the allegations and claims in her state law complaint as a claim for benefits under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) (2001).[6] Although only Liberty moved for summary judgment, the

parties agreed "that the lawfulness of Liberty's termination decision [was] ripe for disposition on the administrative record." *Cook v. Liberty Life,* 2002 WL 31974403, slip op. at 2 (D.N.H. Jan. 15, 2002).

The district court ruled that Liberty's termination of Cook's long-term disability benefits was arbitrary and capricious. It found that Liberty based its decision to terminate benefits on Dr. Blackwood's statement that Cook was able to work forty hours a week and Carol Vroman's vocational analysis showing that there were a number of jobs Cook could take. "The obvious flaw in Liberty's reasoning," the court concluded, "is that it overlooks the fact that Dr. Blackwood informed Liberty shortly after it terminated Cook's benefits that it could not rely on either his March 24, 1997 medical certificate or his response to Liberty's August 18, 1998 letter because neither document reflected his views concerning Cook's ability to work." *Id.* at 14. Liberty ignored this retraction, and "failed to point to any other evidence to contradict the medical evidence that Cook produced to support her disability claim." *Id.* at 14–15. Its termination of her benefits, therefore, was an abuse of its discretion as a plan administrator.[7] Although Liberty pointed to other evidence in the administrative record to support its decision, the court declined to review it, concluding that it could not "review decisions that Liberty never made." *Id.* at 15. Based on this decision, the court entered judgment for Cook for "benefits owed under the plan." *Id.*

6. Section 502 states, in pertinent part:
   (a) A civil action may be brought-
   (1) by a participant or beneficiary-
   . . .
   (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

. . .

7. As the district court correctly pointed out, this Circuit has held that there are no substantive differences between "arbitrary and capricious" and "abuse of discretion" review in the ERISA context. *Id.* at 13 (citing *Pari–Fasano,* 230 F.3d at 418–19).

In response to this ruling, Liberty argued that the court should remand the case back to the plan administrator to reconsider whether Cook was disabled in October 1998 (when it terminated her benefits), or at any time between October 1998 and the district court's judgment. The court found that such an exercise was unnecessary, given that "the only rational decision that [Liberty] could have reached on the administrative record it developed was that Cook's disability benefits should continue." *Cook v. Liberty Life*, 2002 WL 482572, slip op. at 12 (D.N.H. Mar. 29, 2002). The district court summarized the facts that it took into consideration when making its decision:

> (1) Liberty initially found Cook to be disabled and never suggested that its initial decision was erroneous; (2) the relevant documentation contained in the administrative record (as opposed to the non-probative "evidence" Liberty manufactured from Dr. Blackwood's error) did not suggest any material change in Cook's condition at or around the time Liberty terminated her benefits; and (3) Liberty never offered a reasoned explanation as to why the administrative record failed to demonstrate that Cook remained disabled.

*Id.* at 12. The court recognized that the case law was divided on whether a court should award benefits and reinstatement if it found a plan's decision to terminate benefits to be arbitrary and capricious, or whether it should remand to the plan for a new determination of the participant's disability status. However, it concluded that "the better reasoned cases do not require remand where, as here, the claimant was receiving benefits and had her benefits arbitrarily terminated without any record evidence supporting the termination." *Id.* at 13.

Finally, the court decided that it would have been "inequitable ... to permit Liberty to terminate Cook's benefits as of some date after October 31, 1998 but prior to now on grounds that Cook cannot now prove that she was disabled at all times during the past three-plus years" that her administrative appeals and litigation were pending. *Id.* at 13–14. The court recognized that Liberty's termination could make the presentation of such proof even more difficult: "[a]n arbitrary termination of disability benefits to a disabled claimant could well starve the claimant of the resources necessary to generate evidence of continuing disability...." *Id.* at 14 n. 7. On that basis, the district court awarded Cook 42 months of back benefits, reinstatement to the plan as of May 1, 2002 (two days after it entered judgment), attorney's fees, and prejudgment interest. Liberty filed this timely appeal.

## II.

### A. The Termination Decision

■■■ We review the district court's grant of summary judgment de novo. *Terry v. Bayer Corp.*, 145 F.3d 28, 34 (1st Cir.1998). A federal court reviews an insurer's termination decision "under a deferential arbitrary and capricious standard [if] the language of the underlying plan reserves discretion to the insurer in determining eligibility for benefits." *Pari–Fasano*, 230 F.3d at 418 (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)).[8]

---

8. As we have recently recognized, there is no "conflict between the standard of review that federal courts must apply on summary judgment [de novo] and the degree of deference that such courts ultimately owe to plan administrators [arbitrary and capricious]," as "[t]he degree of deference owed to a plan fiduciary is an underlying legal issue that remains the same through all stages of federal adjudication." *Leahy v. Raytheon Co.*, 315

The disability plan in question affords Liberty the power "to construe the terms of this policy and to determine benefit eligibility hereunder." The parties do not contest that this language sufficiently reserves discretion to Liberty. Therefore, we agree with the district court that we can overturn the termination decision only if we find it was arbitrary and capricious. In order to arrive at such a conclusion, we would have to find "that the insurer's eligibility determination was unreasonable in light of the information available to it." *Pari–Fasano*, 230 F.3d at 419. In making this determination, we look to the record as a whole; "the 'whole' record consists of that evidence that was before the administrator when he made the decision being reviewed." *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir.1997).

█ The District Court concluded that Liberty abused its discretion in terminating Cook's benefits because it relied on Dr. Blackwood's response to Liberty in August 1998 that Cook could work 40 hours a week without considering Dr. Blackwood's subsequent explanation that this response was in error. Our reading of the administrative record leaves us with a slightly different understanding of Liberty's response to Dr. Blackwood's correction. Liberty's April 1999 letter to Cook informing her that her appeal of the termination had been denied states: "We have reviewed the additional medical information submitted by Dr. Blackwood." The record indicates that such a review in fact took place. After the Liberty analyst handling Cook's claim received Dr. Blackwood's explanatory letters and Cook's updated medical certificate, she reviewed all of the medical information Cook had submitted since March 1997, including Dr. Blackwood's chart notes and medical certificates, and summarized her findings. Her

conclusion, memorialized in an internal memorandum, was that she questioned "*the validity* of . . . [Dr. Blackwood's] assessment of [Cook's] condition" (emphasis added). Therefore, we disagree with the district court's conclusion that Liberty "overlooked" or "ignore[d]" Dr. Blackwood's May 1997 certificate. Liberty considered that certificate and disagreed with its conclusions. Nevertheless, we still agree with the district court's holding that Liberty's termination of Cook's benefits was arbitrary and capricious. We do so because we find the termination was "unreasonable in light of the information available" to Liberty at the time of its decision. *Pari–Fasano*, 230 F.3d at 419.

### 1. Evidence in the Administrative Record

To support her administrative appeal, Cook presented to Liberty the same type of evidence she had been submitting for the past three years to support her continued eligibility for benefits—letters and forms filled out by Dr. Blackwood in which he gives his opinion that Cook is suffering from "totally disabling ailments," is "not able to perform with any reasonable continuity the material and potential duties of her job or any similar occupation," and should be kept "out of work indefinitely." When Liberty informed Cook that her appeal had been denied—that it was upholding the termination of her benefits even after considering Dr. Blackwood's letters and medical certificate—it told her that "[t]he medical information submitted does not support limitations that would render you incapable of performing the material and substantial duties of any occupation." This statement reflects Liberty's conclusion that Dr. Blackwood's May 1997 certifi-

cate declaring that Cook should be kept "out of work indefinitely" was not credible.

The record reveals three overriding reasons for this rejection. We assess them in turn.

### a. Inconsistent Medical Certificates

Liberty doubted the correctness of the May 1997 certificate because it directly conflicted with the March 1997 medical certificate Dr. Blackwood inadvertently forwarded to it.[9] In its brief to this court, Liberty tries to explain this doubt on two bases. First, it suggests that Dr. Blackwood succumbed to pressure from his patient: "regardless of whether Dr. Blackwood was actually confused by Liberty's August 18, 199[8] letter . . . or was *changing his prior opinion* in response to pressure from Cook to help her with her 'problem with the insurance company.'" (emphasis added). Second, it suggests that Dr. Blackwood fabricated the May certificate with its reference to the "*purported* May 5, 1997 medical certificate" (emphasis added).

These insinuations are not supported by the record. When it received Dr. Blackwood's letters and the May 5, 1997, certificate on November 5, 1998 (as part of Cook's internal appeal), Liberty never contended that the certificate was fraudulent or backdated. There is no indication in the record that the Liberty analysts assigned to Cook's case believed Dr. Blackwood fabricated this May 5, 1997, certificate to help Cook obtain her benefits, and no one mentioned this possibility in the internal memoranda exchanged while evaluating Cook's appeal. Additionally, the medical opinion proffered in the May 5, 1997, certificate was supported by evidence already in Cook's file. On May 5, 1997, Dr. Blackwood recorded on Cook's chart his intent to "put her back out of work on an indefinite basis" after she suffered a "recurrence of chronic fatigue syndrome." Although the record does not establish that the May 5, 1997, certificate itself was forwarded to Liberty on or about that date, Liberty's internal memorandum of May 9, 1997, indicating that Cook's long-term disability benefits had been restored, permits a fair inference that the substance

9. A close examination of the record provides more support for Dr. Blackwood's explanation that he erred both in forwarding the March 24, 1997, certificate to Liberty, and in affirming that the limitations listed on it were still applicable to Cook. As noted in footnote 2, the medical certificate was used by Dr. Blackwood to communicate to an employer the work limitations of an employee in his care. He did not use these certificates for internal record-keeping purposes. There are three medical certificates involved in this dispute:

> (1) A certificate dated March 24, 1997, stating Cook could return to work on April 3, 1997, with the restriction that she could not work more than 40 hours each week and had to have regular breaks. This is the certificate Dr. Blackwood forwarded to Liberty in August 1998 attached to Cook's medical records.

> (2) An undated certificate stating Cook could return to work on April 14, 1997, with the restriction that she could not work more than 40 hours each week and had to have regular breaks. This is the certificate Cook gave to Sanders when she returned to work. Sanders shortly thereafter forwarded it to Liberty.
>
> (3) A certificate dated May 5, 1997, stating Cook was "out of work indefinitely."

Although Dr. Blackwood forwarded certificate (1) to Liberty more than a year after he wrote it, he had never in fact issued this certificate to Cook to present to Sanders. Cook did not return to work on April 3, 1997, as the certificate predicts, nor did she present certificate (1) when she reported to Sanders. When she finally returned to work on April 14, Cook presented to Sanders certificate (2). Certificate (1) is only relevant to this case because it was mistakenly attached to the chart notes Dr. Blackwood sent to Liberty.

of Dr. Blackwood's opinion about Cook's severe work limitations was communicated to Liberty in some fashion on or about May 5, 1997. Also, Dr. Blackwood's chart notes, which had been forwarded to Liberty in December 1997 (and again in August 1998) upon its request as part of its regular review, all confirm Cook's severe work limitations.

The Liberty analyst reviewing Cook's claim in August 1998 likely was confused by the apparent inconsistency between the chart notes (reporting Cook's inability to work) and the erroneously submitted March 1997 medical certificate attached to those chart notes (clearing her to work 40 hours a week). Although Liberty gave Dr. Blackwood the opportunity to explain this inconsistency, he erred again with his "yes" response to Liberty's questioning. Nevertheless, to support Cook's administrative appeal, Dr. Blackwood explained his mistake, reiterated the currently-applicable diagnosis, and submitted the May 1997 medical certificate to buttress his explanation. In submitting that certificate, Dr. Blackwood was not creating a new document or a new diagnosis. Instead, he was reminding Liberty of his long-standing diagnosis of Cook, modified only for that brief period of time when she returned to work in April 1997, and previously accepted by Liberty as a sound basis for the payment of disability benefits. Therefore, the highly charged suggestions of succumbing to pressure from a patient and fabrication have no support in the record.

### b. Lack of Objective Evidence

The Liberty analyst handling Cook's claim concluded that there were no "clinical objective findings to support the fibromyalgia or chronic fatigue syndrome" diagnoses. She added that Dr. Blackwood's assessment of Cook's condition appeared "to be based on just [Cook's] subjective complaints." Although this analyst asked Dr. Blackwood for "copies of all diagnostic testing" and "a copy of the complete pulmonary function test," she did not receive this information.

Liberty sought evidence from tests that were independent of Cook's reporting of her symptoms. In many instances, such a requirement would be justified. However, as we have recognized, "[d]iagnosing CFS is not sport for the short-winded." *Rose v. Shalala*, 34 F.3d 13, 18 (1st Cir.1994). "[T]here is no 'dipstick' laboratory test for chronic fatigue syndrome." *Sisco v. HHS*, 10 F.3d 739, 744 (10th Cir.1993). *See also Vega v. Comm. of Social Security*, 265 F.3d 1214, 1219 (11th Cir.2001) ("We note that the Social Security Administration recently concluded that there are no specific laboratory findings that are widely accepted as being associated with CFS."). Given the nature of Cook's disease, it was not reasonable for Liberty to expect her to provide convincing "clinical objective" evidence that she was suffering from CFS.[10] *See Mitchell*, 113 F.3d at 443 ("[I]t would defeat the legitimate expectations of participants in the [ ] Plan to require those with CFS to make a showing of clinical

---

**10.** Tests are available to determine whether a CFS sufferer has an elevated level of Epstein-Barr Virus ("EBV") antibodies, but the relationship between EBV and CFS is unclear. As the National Institute of Health reports: "High levels of EBV antibodies have now been found in some healthy people as well as in some people with CFS. Likewise, some people who don't have EBV antibodies, and who thus have never been infected with the virus, can show CFS symptoms." National Institutes of Health, *Fact Sheet: Chronic Fatigue Syndrome, at* http://www.niaid.nih.gov/factsheets/cfs.htm (January 2001). When Dr. Blackwood first diagnosed Cook, he reported she had an elevated level of EBV.

evidence of such etiology as a condition of eligibility for LTD benefits.").

### c. Work at a Real Estate Agency

As a final reason for rejecting Dr. Blackwood's medical opinion as sufficient "proof," the Liberty analyst handling Cook's claim cites "[t]he fact that [Cook] has been working part time as a realator [sic] during the time her MD has stated she is completely disabled." In May 1997, an employee of Sanders informed Liberty that Cook was working at a real estate agency while she was receiving disability benefits from Liberty. Cook acknowledged that she had started working "a few hours a week doing real estate open houses and a few showings." A Liberty claims analyst informed her that her disability benefits would be offset by the income she was receiving from her part-time job.[11] She was further told that she could work on a part-time basis while continuing to receive benefits, so long as her earnings did not go above a certain limit. As a follow-up to this conversation, he faxed her a section of the plan document explaining the offset process. He then contacted the agency for which Cook was working and requested Cook's earnings history. The agency informed Liberty that Cook had begun working in April 1997, and between April and July 1997, she had netted $175 in income. Her job duties included "occasional open houses, showings, [and] customer phone calls," but Cook was not putting in "desk time." This is the extent of the information in the administrative record relating to Cook's part-time job. In February 1998, Liberty requested that Cook provide information regarding her total earnings from this job, and in August 1998, it sent the same request to the real estate agency. It does not appear from the documents in the record that either responded.

In relying on Cook's limited work at the real estate agency as a basis for rejecting Dr. Blackwood's assessment of Cook's total disability, Liberty ignores the fact that Cook had discussed her part-time work with Liberty analysts. None of them mentioned to her that her work left her in danger of losing her disability benefits. In fact, the plan states: "If the Covered Person is earning less than 20% of his Pre-Disability Earnings, the Disability Benefit will be paid." Therefore, the plan specifically contemplates the possibility that a person receiving full disability benefits could also be working part-time—but she could earn no more than 20% of her former salary at Sanders.

Moreover, even with deferential review, Liberty possessed too little information regarding Cook's part-time work history to support a decision to terminate her benefits on that ground. At the time it made its initial decision, Liberty knew only that Cook had earned $175 over three months in 1997 and had worked a few Sundays tending open houses. It is true that Liberty requested, and Cook failed to provide, her W–2 form for 1997 from the real estate agency. She should have provided that information. Yet Liberty did not rely on Cook's lack of response to its request for her W–2 form as a basis for its termination decision. Instead, it saw in Cook's realtor work another reason for questioning the veracity of Dr. Blackwood's opinion that

---

11. This analyst was referring to the Quick Recovery Program in the long-term disability policy. Under this program, someone who is partially disabled and thus unable to work full-time can receive a "Loss of Earnings Monthly Benefit" to make up for some of the gap between her former salary and her part-time salary. The plan defines someone who is "partially disabled" as one who is "able to perform all the material and substantial duties of his own or any other occupation on a part-time basis."

she was "out of work indefinitely." However, Liberty's evidence that Cook was working elsewhere was so thin and outdated that it could not have reasonably relied on it as a basis for rejecting Dr. Blackwood's assessment of Cook's severe working limitations. Indeed, Liberty did not point out to Cook, either in its initial termination letter, or in its letter affirming its denial, that her part-time work at the agency factored into its decision. The failure to do so suggests Liberty's own recognition of the weakness of this evidence as a basis for terminating Cook's benefits.

### 2. Conclusion

In pursuing her appeal with Liberty, Cook provided the same type of evidence that she had always proffered to prove her claim—Dr. Blackwood's medical opinion, backed up by his chart notes. These documents were the only medical documents in Cook's file. Cook had been receiving disability benefits since May 1995, including under the "any occupation" definition of disabled since May 1997. Except for a slight period of improvement in March–April 1997, Cook's CFS and related ailments had been sufficiently disabling throughout that time, according to the medical evidence provided, to justify the payment of disability benefits. In changing course, Liberty greatly exaggerated the significance of a confused but promptly explained response from Dr. Blackwood, made an unjustified (and consequently, unfulfilled) demand for objective medical evidence, and relied on sketchy information of part-time work. None of this is sufficient to reverse Liberty's previous acceptance of Dr. Blackwood's medical opinion.

These deficiencies in record support would not be so consequential if Liberty had developed any contradictory medical evidence in the record to support its decision to reject Cook's evidence. For exam-

ple, if it seriously questioned the veracity of Dr. Blackwood's opinion, Liberty could have required Cook to get an Independent Medical Examination or subjected Dr. Blackwood's chart notes and opinions to review by another physician. None of this happened. To be sure, we are not suggesting that such steps are necessary in every termination of disability benefits case to establish a reasonable basis for the termination. Satisfying that burden will always depend on the specific facts of the case. There may well be cases where the opinion of the claimant's treating physician can be rejected without reliance on any contradictory medical evidence developed by the plan administrator. Here, however, without another reasonable basis for rejecting Dr. Blackwood's opinion, the absence of that contradictory evidence is fatal to Liberty's case. *Cf. Miller v. United Welfare Fund,* 72 F.3d 1066, 1073 (2d Cir. 1995) ("In effect, the Fund argues that both 'common sense' and the very decision it was reviewing were sufficient to overcome [the doctor's] statement that he and the medical team at [the hospital] believed that private nursing care was necessary for [the claimant's] full recovery. We find that the Fund's *ipse dixit* pronouncement . . . [was] insufficient to contradict the only piece of expert evidence.").

### B. Remedy

After concluding that Liberty's decision was arbitrary and capricious, the district court entered a final judgment in favor of Cook for forty-two months of back benefits and pension contributions for the period between November 1, 1998 and May 1, 2002 (two days after judgment was entered), reinstatement to the plan as of May 1, 2002, attorney's fees, and prejudgment interest. Liberty argues on appeal that the court should have remanded to the plan administrator the issue of whether Cook was disabled during the litigation

and the pendency of her appeal. We disagree.

■■■ An appellate court reviews a district court's choice of remedy for an ERISA violation for abuse of discretion. *Zervos v. Verizon New York Inc.*, 277 F.3d 635, 648 (2d Cir.2002); *Grosz–Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163 (9th Cir.2001). Once a court finds that an administrator has acted arbitrarily and capriciously in denying a claim for benefits, the court can either remand the case to the administrator for a renewed evaluation of the claimant's case, or it can award a retroactive reinstatement of benefits. *See Welsh v. Burlington N., Inc., Employee Benefits Plan*, 54 F.3d 1331, 1340 (8th Cir.1995) (recognizing that a district court has power to calculate and award unpaid benefits).

Liberty cites the familiar proposition that ERISA "provides no authority for a court to render a *de novo* determination of an employee's eligibility for benefits" in support of its argument that the district court could not award Cook retroactive benefits. *Peterson v. Cont'l Cas. Co.*, 282 F.3d 112, 117 (2d Cir.2002). Important though it is in many other contexts, this axiom underlying the principle of ERISA deference does not deprive a court of its discretion to formulate a necessary remedy when it determines that the plan has acted inappropriately. "[R]etroactive reinstatement of benefits is appropriate in ERISA cases where, as here, 'but for [the insurer's] arbitrary and capricious conduct, [the insured] would have continued to receive the benefits' or where 'there [was] no evidence in the record to support a termination or denial of benefits.'" *Grosz–Salomon*, 237 F.3d at 1163 (modifications in original) (quoting *Quinn v. Blue Cross & Blue Shield Ass'n.*, 161 F.3d 472, 477 (7th Cir.1998)); *see also Zervos*, 277 F.3d at 648 ("[A] remand of an ERISA action

seeking benefits is inappropriate where the difficulty is not that the administrative record was incomplete but that a denial of benefits based on the record was unreasonable.") (internal quotation marks omitted); *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1330 (11th Cir. 2001) ("We do not agree, however, that a remand to the plan administrator is appropriate in every case."); *Grosz–Salomon*, 237 F.3d at 1163 ("[A] plan administrator will not get a second bite at the apple when its first decision was simply contrary to the facts.").

We acknowledge that several of these quotations may overstate the matter. We have no doubt that in some situations a district court, after finding a mistake in the denial of benefits, could conclude that the question of entitlement to benefits for a past period should be subject to further proceedings before the ERISA plan administrator. This might be true, for example, if the denial is less flagrant than in this case and if there were good reason to doubt that a reassessment would justify benefits for some or all of the past period. However, the variety of situations is so great as to justify considerable discretion on the part of the district court and, in this instance, it has not been abused.

Liberty argues that there is no evidence of Cook's disability status after October 1998, when it terminated her disability benefits, and hence no basis for awarding her disability benefits past that date. However, the absence of information about Cook's disability status resulted directly from Liberty's arbitrary and capricious termination of her benefits. As a recipient of disability benefits, Cook was under a continuing obligation to adduce proof of her disability pursuant to the long-term disability plan. Once Liberty terminated her benefits, she was no longer obliged to update Liberty on her health status. It

would be patently unfair to hold that an ERISA plaintiff has a continuing responsibility to update her former insurance company and the court on her disability during the pendency of her internal appeals and litigation, on the off chance that she might prevail in her lawsuit. Moreover, as the district court notes in its decision, reconstruction of the evidence of disability during the years of litigation could be difficult for a recipient of long-term disability benefits wrongly terminated from a plan.

This is not to say that Liberty cannot terminate Cook's benefits in the future. Once she is reinstated to the plan, she will again be obligated to prove that she is disabled under the "any occupation" definition listed in the plan documents. If she cannot do so, or if Liberty acquires sufficient evidence to contradict her doctor's opinion, it could pursue termination of her eligibility for benefits at that time.

■ The district court also awarded Cook attorney's fees, as it has discretion to do under 29 U.S.C. § 1132(g)(1). An appellate court reviews an award of attorney's fees solely for abuse of discretion. *Cottrill v. Sparrow, Johnson & Ursillo, Inc.*, 100 F.3d 220, 223 (1st Cir.1996). We find no abuse of discretion in that award.

### III.

For the aforementioned reasons, we *affirm* the trial court's determination that Liberty arbitrarily and capriciously terminated Cook's eligibility for long-term disability benefits. We also *affirm* the court's award of forty-two months of back benefits and pension contributions, its order of reinstatement to the plan effective May 1, 2002, and the award of attorney's fees. Appellant is responsible for all costs associated with this appeal.

*So ordered.*

### Appendix: Important Dates and Events

| | |
|---|---|
| February 1995 | Cook files claim with Liberty for short-term disability benefits. |
| April 1995 | Cook files claim with Liberty for long-term disability benefits. |
| May 8, 1995 | Her claim is approved because she meets the "own occupation" definition of disabled. |
| March 1997 | Liberty requests updated medical information and informs Cook it will be reviewing her disability status to determine whether she meets the "any occupation" definition of disabled. |
| April 1997 | Dr. Blackwood reports that Cook's condition has improved and he releases her to return to work "on a trial basis." |
| April 14, 1997 | Cook returns to work and Liberty temporarily suspends her disability benefits. Cook presents Liberty with a "medical certificate" signed by Dr. Blackwood authorizing her return to work. |
| May 5, 1997 | Cook suffers a recurrence of CFS as a result of an infected tooth. Dr. Blackwood determines Cook is no longer able to work 40 hours a week, and records in his notes that she is "out of work on an indefinite basis." |
| May 9, 1997 | Liberty renews Cook's long-term disability benefits under the "any occupation" standard. |
| July 23, 1998 | Liberty requests updated medical information from Cook and Dr. Blackwood. |
| August 13, 1998 | Dr. Blackwood responds to Liberty's request, forwarding copies of chart notes and a "medical certificate" dated March 24, 1997. |
| August 18, 1998 | Liberty writes to Dr. Blackwood, asking whether the work limitations listed on the medical certificate were still applicable to Cook. Liberty attaches the medical certificate in question to this letter. |
| September 9, 1998 | Dr. Blackwood responds "Yes" to Liberty's inquiry. |
| October 16, 1998 | Liberty terminates Cook's benefits. |
| November 5, 1998 | Cook appeals Liberty's decision. She attaches three letters from Dr. Blackwood that describe her disability and its attendant work limitations. She also forwards a "medical certificate" signed by Dr. Blackwood and dated May 5, 1997, which states that Cook is "out of work indefinitely." |
| April 12, 1999 | Liberty affirms its decision. |