**Wanda IVY, Plaintiff,**

v.

**RAYTHEON EMPLOYEES DISABILITY TRUST, Raytheon Company, and Metropolitan Life Insurance Company, Defendants.**

**No. CIV.A. 03–10815–WGY.**

United States District Court, D. Massachusetts.

March 9, 2004.

Richard S. Weiss, Richard S. Weiss & Assoc., Boston, MA, for Wanda Ivy, Plaintiff.

Stephen S. Churchill, James F. Kavanaugh, Jr., Conn, Kavanaugh, Rosenthal, Peisch & Ford, LLP, Boston, MA, for Metropolitan Life Insurance Company, Raytheon Company, Raytheon Employees' Disability Trust, Defendants.

*MEMORANDUM*

YOUNG, Chief Judge.

## I. INTRODUCTION

The plaintiff, Wanda Ivy ("Ivy"), brought this action against Raytheon Disability Trust (the "Trust"), Raytheon Company ("Raytheon"), and Metropolitan Life Insurance Company ("MetLife") for reinstatement of her long term disability benefits pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). After hearing oral argument on January 13, 2004, the Court entered an order allowing the Defendant's Motion for Summary Judgment [Doc. No. 11]. *See* Order of 1/14/04 [Doc. No. 22]. This memorandum sets for the analysis that led to that order.

## II. BACKGROUND

The undisputed facts of Ivy's employment, medical condition, and treatment are taken from MetLife's claim file. Defs.' Ex. B [Doc. No. 15].

### A. Ivy's Employment History with Raytheon

Ivy began working for Raytheon on February 14, 1977. *Id.* at 216. She was last employed as "Materials Handler C," with somewhat ambiguous duties. *Id.* Ivy stated that she "works in shipping and receiving and does a lot of lifting some-

times up to 80–90 pounds." *Id.* at 86. She described herself as a "shipper" on an insurance form and reported to her treating physician that she was involved in "box shipping, lifting packages, load[ing] and unload[ing] trucks, single lifting thirty to forty pounds." *Id.* at 40, 164. In their respective treatment notes, Ivy's therapist reported that she was a fork-lift operator, *id.* at 53, but her psychiatrist noted that she worked at a desk job immediately prior to leaving Raytheon. *Id.* at 31.

Ivy stopped working on July 28, 2000 due to bursitis and an injury in her left shoulder. *Id.* at 113, 216. Shortly thereafter, she began to complain of debilitating anxiety concerning alleged marital problems.[1] Her psychological problems prevented her from returning to work after her physical impairments improved.

### B. Raytheon's Long Term Disability Plan

While employed by Raytheon, Ivy participated in the company's long term disability benefits plan (the "Plan"). The Plan provides benefits to covered employees who meet the defined requirements for being fully disabled[2] for eighteen months or totally disabled[3] thereafter. Defs.' Ex. A [Doc. No. 15] ¶¶ 1.2, 2.19, 2.22, 5.1. The Plan receives its funding exclusively from

---

1. The exact onset of Ivy's psychological problems is unclear. She first saw a psychologist on August 23, 2000. Defs.' Ex. B at 180. A note from her treating physician dated August 24, 2000, however, refers only to her physical injuries. *Id.* at 198. A second note from her physician, dated October 20, 2000, states that Ivy developed an anxiety disorder at the same time that she was being treated for her physical injuries. *Id.* at 184.

2. A plan participant is "fully disabled" if "because of a sickness or injury which is not covered by an applicable workers' compensation statute, a Participant: (i) cannot perform the essential elements and substantially all of

the duties of his or her job with the Employer even with a reasonable accommodation; and (ii) is under the care of a Doctor." Defs.' Ex. A ¶ 2.11.

3. A plan participant is "totally disabled" if "because of sickness or an injury which is not covered by an applicable workers' compensation statute: (A) a Participant cannot do the essential elements and substantially all of the duties of his or her job with the Employer even with reasonable accommodations; and (B) cannot do any other job for which he or she is fit by education, training, or experience." Defs.' Ex. A ¶ 2.23.

employees who choose to participate. *Id.* ¶ 1.2.

MetLife, the Claims Administrator, has a fiduciary duty to restrict Plan benefits to employees who meet the established eligibility criteria. *Id.* ¶¶ 2.5, 7.3. Furthermore, the Plan grants MetLife *"full discretion* [ ] to interpret the Plan with respect to claims for Benefits; to determine whether a claimant is eligible for Benefits; and to resolve any other matter related to claims under the Plan (including appeals of denied claims)." *Id.* ¶ 8.5 (emphasis added).

### C. Ivy's Medical Condition

While Ivy's initial disability was based on a physical injury, her claim for long term disability is based exclusively on psychological and emotional impairments. She sought treatment from a physician, psychologist, psychiatrist, and therapist. The medical and psychiatric records provided by these treating doctors were reviewed by two independent physicians employed by MetLife.

Ivy's treating physician, Theresa Chang, M.D. ("Dr.Chang"), noted on October 20, 2000 that Ivy had developed an anxiety disorder and was disabled. Defs.' Ex. B at 184. Eight months later, Dr. Chang stated that Ivy "remains disabled at this time" but provided no further details as to the severity or extent of Ivy's impairments. *Id.* at 69.

Ivy's psychologist, Paul Jansen, Ph.D. ("Dr.Jansen"), diagnosed her with generalized anxiety on August 23, 2000. *Id.* at 179. He amended his diagnosis to major depression in November, 2002. *Id.* at 62. He consistently opined that Ivy's attention and concentration were impaired and that she could not return to work operating a fork-lift. *Id.* at 59, 60. He noted, however, that she was capable of carrying out routine daily activities such as taking care of her children and running errands and that she might be able to return to less demanding work. *Id.* He stated:

> Ms. Ivy's disability falls within some very specific parameters. For example, a problem with attention or concentration would be dangerously disabling to an air-traffic controller, but might have a minimal impact on a person who stocks supermarket shelves.... Ivy's ... inability to focus/concentrate clearly put her and her co-workers at risk for significant injury.... [S]he was and continues to be functionally disabled.

*Id.* at 60 (emphasis in original).

Ivy was also treated by psychiatrist Burns Woodward, M.D. ("Dr.Woodward"), who diagnosed her with major depression with psychotic features. *Id.* at 157. Dr. Woodward's treatment notes mention that Ivy exhibited features of depression including excessive crying, sleep problems, lack of energy, and poor concentration but that she could do chores, run errands, take care of her three children, and perform other activities of daily living. *Id.* at 93–99. He noted that he was unable to evaluate Ivy's work capacity, *id.* at 96, and that she was "disabled from her current job but not from any job." *Id.* at 97. In a discussion with Dr. Jansen, Dr. Woodward agreed that Ivy was "not making much progress." *Id.* at 25. Dr. Woodward consistently noted that while Ivy suffered from symptoms of depression, medication was unlikely to very beneficial because she was "stuck" in an unhappy marital situation. *Id.* at 97–99.

In 2002, Ivy saw a therapist, Marcia Drootin, R.N., M.S., C.S., who stated that Ivy was not improving and her prognosis was uncertain. *Id.* at 37.

To assist it in evaluating Ivy's claim, MetLife submitted her entire file to two independent medical consultants for review. Leonard Kessler, M.D. ("Dr.Kessler"), a physician board certified in psy-

chiatry and neurology, reviewed Ivy's file four times. He reviewed treatment notes from Drs. Jansen and Woodward and conducted teleconferences with both doctors. In a report dated December 27, 2000, Dr. Kessler summarized the findings of Drs. Jansen and Woodward and noted that Ivy was "very depressed, preoccupied to the point of being delusional, and impaired in her daily activities. . . . It would be expected that, with comprehensive treatment, the duration of this impairment would be about a month." *Id.* at 154. On March 15, 2001, Dr. Kessler reported that there were no objective formal mental status examinations to support Ivy's subjective complaints of impaired attention and concentration. *Id.* at 127. Dr. Kessler's final report dated May 2, 2002 noted that during the previous year, Ivy had not exhibited psychotic symptoms or taken neuroleptic medications, had seen her psychologist and psychiatrist each only once a month, and had exhibited merely "SOME depressive symptoms." *Id.* at 88–89 (emphasis in original). He concluded that "[t]here is no objective medical documentation to show significant functional limitations . . . . This does not support the presence of a severe and sustained psychiatric disorder resulting in marked functional limitation." *Id.* at 89.

Ivy's file was also reviewed on December 26, 2002 by Mark Schroeder, M.D. ("Dr.Schroeder"), a physician board certified in neurology and psychiatry. Dr. Schroeder concluded that Ivy's file did not contain evidence that demonstrated the existence of a "severe global objective psychiatric impairment sufficient to preclude [Ivy] from performing the essential duties of her own occupation as a Materials Handler." *Id.* at 17. He noted that Dr. Woodward's records did not address how Ivy's preoccupation with her marital problems would affect her ability to perform the essential obligations of her job. *Id.* Dr. Schroeder also determined that Dr. Jansen

did not provide objective evidence of Ivy's attention or concentration deficits and that his notes document "primarily self-reported symptoms of emotional distress, and describe primarily family stresses and conflicts." *Id.*

### D. Termination of Ivy's Benefits

MetLife initially approved Ivy's short term disability benefits for the period August 2, through October 31, 2000. *Id.* at 64. At the conclusion of this period, Ivy's condition satisfied the Plan's definition of "full disability" and on November 1, 2000, she began to receive long term disability benefits. *Id.* Shortly thereafter, MetLife concluded that Ivy's condition had improved and terminated her benefits on March 15, 2001. *Id.* at 64–67. In a letter to Ivy informing her of the termination, MetLife commented on the "lack [of] information regarding treatment at the level of intensity indicative of a severe psychiatric disorder preclusive of work ability." *Id.* Ivy appealed MetLife's decision to terminate her benefits but her appeal was unsuccessful. *Id.* at 10–12.

## III. DISCUSSION

### A. Standard of Review

Under ERISA, the standard of review applied to determinations of benefits eligibility depends on whether the claim administrator or fiduciary is vested with discretionary authority. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Absent discretionary authority, the determination is reviewed *de novo. Id.* Where the claim administrator has been granted discretion, however, the determination is reviewed under a more deferential "arbitrary, capricious, or an abuse of discretion" standard. *Doyle v. Paul Revere Life Ins.,* 144 F.3d 181, 183 (1st Cir.1998) (quoting *Diaz v. Seafarers Int'l Union,* 13 F.3d 454,

456 (1st Cir.1994)); *see Sullivan v. Raytheon Co.*, 262 F.3d 41, 50 (1st Cir.2001) (applying the arbitrary and capricious standard to benefits determinations made by MetLife under the Plan at issue here); *Vlass v. Raytheon Employees Disability Trust*, 244 F.3d 27, 29–30 (1st Cir.2001) (same).

■ Under an arbitrary and capricious standard, "the administrator's decision will be upheld if it was within the administrator's authority, reasoned, and 'supported by substantial evidence in the record.'" *Sullivan*, 262 F.3d at 50 (quoting *Doyle*, 144 F.3d at 184). Evidence is "substantial" if it is "reasonably sufficient to support a conclusion." *Id.* at 51. The claim administrator, and not the Court, has responsibility to weigh conflicting evidence. *Vlass*, 244 F.3d at 32; *see also Guarino v. Metropolitan Life Ins. Co.*, 915 F.Supp. 435, 445 (D.Mass.1995) (Woodlock, J.). Accordingly, the question before the Court "is not which side [the Court] believe[s] is right, but whether the insurer had substantial evidentiary grounds for a reasonable decision in its favor." *Matias–Correa v. Pfizer, Inc.*, 345 F.3d 7, 12 (1st Cir.2003) (quoting *Brigham v. Sun Life of Canada*, 317 F.3d 72, 85 (1st Cir.2003)).

### B. Summary Judgment Standard

There is arguably some tension between the arbitrary and capricious standard used in reviewing ERISA benefits determinations and the summary judgment standard, which requires the court to draw all inferences in favor of the non-moving party. *See Leahy v. Raytheon Co.*, 315 F.3d 11, 17 (1st Cir.2002). The First Circuit has clarified the Court's role in applying these standards:

This respectful [arbitrary and capricious] standard requires deference to the findings of the plan administrator, and, thus, even under Fed.R.Civ.P. 56, does not permit a district court independently to weigh the proof. Rather, the district court must ask whether the aggregate evidence, viewed in the light most favorable to the non-moving party, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits.

*Id.* at 18.

### C. Review of MetLife's Determination

Ivy argues that MetLife's decision to discontinue her long term disability benefits after March 15, 2001 was arbitrary and capricious in that MetLife disregarded the prognoses of Ivy's treating doctors and relied exclusively on the conclusions of independent medical consultants. Compl. [Doc. No. 1] ¶ 13. She contends that the conclusions of Drs. Kessler and Schroeder are not supported by any corroborating evidence and directly contradict the findings of her treating doctors. *Id.* She also contends that she was never informed of MetLife's desire for objective medical evidence.

■ Ivy's argument that the opinions of her treating doctors must be given more weight than the conclusions of the reviewing physicians cannot stand. The Supreme Court has held that under ERISA, employee benefits plan administrators "are not obliged to accord special deference to the opinion of treating physicians." *Black and Decker Disability Plan v. Nord*, 538 U.S. 822, 123 S.Ct. 1965, 1966, 155 L.Ed.2d 1034 (2003). Even in the face of conflicting medical evidence, it is reasonable for the claim administrator to rely on the conclusions of independent medical consultants rather than conclusions of treating physicians. *See Matias–Correa*, 345 F.3d at 12; *Lopes v. Metropolitan Life Ins. Co.*, 332 F.3d 1, 5–6 (1st Cir.2003) (upholding an administrator's reliance on a non-examining physician's report even though a

treating physician had stated that the claimant was totally disabled); *Vlass*, 244 F.3d at 30–32 (finding a termination of benefits reasonable notwithstanding conflicting evidence provided by the treating physicians, reviewing physicians, and vocational assessor). That MetLife based its decision to terminate Ivy's benefits on the reports of reviewing physicians and did not accord more weight to her treating physicians and therapists is not, by itself, unreasonable.

■ Ivy relies on *Cook v. Liberty Life Assurance Co.*, 320 F.3d 11 (1st Cir.2003), for the proposition that the conclusions of a claimant's treating doctors cannot be rejected. *Cook*, however, is distinguishable. In *Cook*, the claimant's benefits were terminated after her physician filled out an insurance form and mistakenly noted that the claimant could work full-time. *Id.* at 15–16. The First Circuit concluded that the administrator exaggerated the significance of the mistaken report and improperly denied benefits. *Id.* at 17. In Ivy's case, while there was a miscommunication between Drs. Jansen and Kessler,[4] the mistake was acknowledged by Dr. Kessler in a later report and did not result in a different conclusion.

*Conrad v. Reliance Standard Life Insurance Co.*, 292 F.Supp.2d 233 (D.Mass. 2003) (O'Toole, J.), is also distinguishable. In *Conrad*, Judge O'Toole held that the plan administrator acted arbitrarily and capriciously by relying on the report of an independent medical consultant rather than the claimant's treating physicians. *Id.* at 237–38. The reviewing physician, who based his reports on the claimant's

medical records, omitted facts favorable to the claimant and emphasized unfavorable comments. *Id.* at 238. Judge O'Toole reasoned that "[a]lthough it would certainly be permissible for a reviewer ... to summarize and condense the findings of other doctors, it was incumbent on him to do so in an even-handed and fair-minded manner, and it is clear that he did not." *Id.* Again, these facts are not analogous to Ivy's present claim. Drs. Kessler and Schroeder accurately represented the findings of Drs. Jansen and Woodward. Specifically, Drs. Kessler and Schroeder documented not only that Ivy had reported serious psychological and emotional problems, but also that she was able to perform activities of daily living and might be capable of returning to work at a job that did not require heightened vigilance. Based on their review of this evidence, the consultants were simply unconvinced that Ivy's subjective complaints were evidence of a severe global psychiatric disorder that would preclude her from performing her job.

Finally, given the nature of Ivy's impairments, it was reasonable for MetLife to request objective evidence documenting her functional limitations. The instant case is distinguishable from *Cook*, in which the First Circuit held that it was unreasonable for the plan administrator to expect the employee to provide objective medical evidence to document and support a diagnosis of chronic fatigue syndrome because there were no laboratory tests to confirm the diagnosis. 320 F.3d at 21. Unlike the medical impairment at issue in *Cook*, there

---

**4.** Dr. Kessler's consultant report of December 11, 2000 misquoted Dr. Jansen by stating that Dr. Jansen found "no impairments in memory attention or concentration." Defs.' Ex. B at 104. Dr. Jansen corrected this mistake in a February 20, 2001 letter to MetLife, acknowledging that "an important miscommunication occurred.... [T]he essence of Ms. Ivy's func-

tional disability *is* in the area of impaired attention and concentration." *Id.* at 60 (emphasis in original). Dr. Kessler acknowledged the mistake in his consultant report of March 15, 2001 but noted that Dr. Jansen did not provide any objective evidence of functional limitations in the areas of attention and concentration. *Id.* at 100.

are accepted mental status examinations that could have provided objective evidence to support Ivy's claim. *See, e.g., Conner v. Apfel,* 1999 WL 495646, \*1 (N.D.Ill. June 28, 1999) (listing the Zung Depression and Anxiety Scales among the tests administered during a mental status examination of a Social Security claimant); *Wiggins v. Apfel,* 29 F.Supp.2d 486, 489 n. 1 (N.D.Ill.1998) (listing seven tests administered to determine the mental status of a Social Security claimant).

Moreover, Ivy's argument that she was never informed of the need for such objective evidence is unconvincing. When Ivy's benefits were first terminated, MetLife informed her that she had failed to submit objective evidence of her functional limitations. Defs.' Ex. B at 66–67. She did not submit any objective evidence to MetLife or to this Court in connection with her appeal.

## IV. CONCLUSION

Because MetLife's benefits determination was not arbitrary and capricious, the Defendants' Motion for Summary Judgment [Doc. No. 11] was ALLOWED.