**Maureen Keough v. Liberty Life Assur. CV-03-266-PB  02/24/05**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**


**Maurene Keough**

    **v.**                                     Civil No. 03-266-PB
                                        Opinion No. 2005 DNH 032
**Liberty Life Assurance
Company of Boston**



**MEMORANDUM AND ORDER**

Maurene Keough brings this claim for disability benefits pursuant to the Employee Retirement Income Security Act of 1974, ("ERISA") as amended, 29 U.S.C. § 1132(a)(1)(B), to recover benefits allegedly due her under the terms of the Liberty Mutual Insurance Company's Long-Term Disability Plan ("Plan"). The Plan is administered by defendant Liberty Life Assurance Company of Boston ("Liberty Life"). In the single count of the complaint, Keough alleges that defendant Liberty Life's decision to terminate her long term disability benefits was improper and contrary to the weight of the evidence. Before me are Liberty Life's motion for summary judgment (Doc. No. 9) and Keough's cross motion for summary judgment (Doc. No. 14). For the reasons set forth below, I grant Liberty Life's motion and deny Keough's

motion.

## BACKGROUND[1]

Maurene Keough worked for the Liberty Mutual Insurance Company ("Liberty Mutual") as a business analyst for 32 years until she was hospitalized with a serious heart condition in October 2000. Compl. at ¶ 5. As a regular employee of Liberty Mutual, she was eligible to participate in the Plan. Admin R. 30, 33.

### A. The Plan

The Plan provides, among other benefits, long-term disability ("LTD") coverage to eligible employees through a group insurance policy sponsored by Liberty Mutual and issued by Liberty Life. Admin. R. 1. In particular, the Plan provides for the payment of LTD benefits to eligible employees who are determined by Plan Administrator Liberty Life to be "[d]isabled." Id. at 13. The Plan divides eligibility for long-term disability benefits into two phases. During the first phase of up to 18

---

[1] The background facts set forth herein are taken from the Administrative Record ("Admin. R.") filed by Liberty Life as an appendix in support of its motion for summary judgment. Where appropriate, additional facts are taken from the pleadings.

months, an employee will be considered "disabled" if, "due to Injury or Sickness," she is "unable to perform all of the material and substantial duties of [her] own occupation." Id. at 6, 31. In the second phase, after collecting benefit payments for 18 months, an employee will continue to be considered "disabled" only if she is "unable to perform, with reasonable continuity, all of the material and substantial duties of [her] own occupation or any other occupation for which [she] is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity."[2] Id.

The burden is on the employee to submit to Liberty Life proof that she is disabled and requires the regular attendance of a physician. Id. at 13. The Plan also provides that long-term disability benefits will be paid for the "period of Disability if the [employee] gives to Liberty proof of continued" disability and the need for continued regular attendance of a physician. Id. (Emphasis added). Furthermore, the Plan specifies that long-term disability benefits will cease if the employee is no longer

_____

[2] The two phases of disability under the Plan are frequently referred to as the "own occupation" period (first 18 months) and the "any occupation" period (after 18 months).

disabled.  Id. at 17.  The Plan expressly invests Liberty Life, the Plan Administrator, with

> the authority, in its sole discretion, to construe the terms of this Plan and decide all questions of eligibility, determine the amount, time and manner of payments of any benefits and decide any other matters relating to the administration or operation of the Plan.

Id. at 39.  Finally, the Plan specifies that any "interpretations or decisions of the Plan Administrator shall be conclusive and binding."  Id.

**B.   Keough's Claim for Short Term Disability Benefits**

On October 18, 2000, Keough went to the emergency room at the Wentworth-Douglass Hospital in Dover, New Hampshire, complaining of chest pain and shortness of breath.  Admin. R. 88, 100.  She was seen by Michael Jacuch, M.D., of Seacoast Cardiology Associates and later diagnosed with unstable angina, severe coronary artery disease, hypothyroidism, and hyperlipidemia with fasting cholesterol.  Id. at 96-99.

On October 26, 2000, Keough was transferred to Portsmouth Regional Hospital for coronary artery bypass surgery.  Id. at 100.  Keough underwent quadruple bypass surgery on November 1, 2000; the surgery was performed by Donato Sisto, M.D. of Coastal

-4-

Cardiothoracic Associates.  Id. at 103.  According to her November 7, 2000 discharge summary, "postoperatively [Keough] has done very well.  She has had an uncomplicated course without dysrhythmia or complications."  Id. at 105-06.

While she was still hospitalized, Keough applied for short-term disability benefits ("STD") for the period from October 25, 2000, through December 7, 2000.  Id. at 109.  Liberty Life's case manager, Deneen DeCost, requested medical records from Dr. Sisto and Dr. Jacuch and asked them each to complete a Restrictions form and a Physical Capacities form.  Id. at 76, 80.  In response to this request, Dr. Jacuch forwarded Keough's medical records, but did not complete the forms, explaining that he had not yet seen Keough in his office "post-hospitalization."  Id. at 85-87.  Dr. Jacuch indicated, however, that Keough had an appointment for an office visit on December 7, 2000.  Id. at 87.  Nevertheless, by letter dated November 8, 2000, Liberty Life approved Keough's claim for STD benefits through December 7, 2000.  Id. at 109.

Unlike Dr. Jacuch, Dr. Sisto returned completed Restrictions and Physical Capacities forms to Liberty Life.  Id. at 112-13.  On the Restrictions form he estimated that Keough would be able to return to work in January 2001.  Id. at 112.  Dr. Sisto

-5-

indicated that Keough should engage in "no driving, no lifting 5 lbs or more" and he instructed her "not to walk or sit for a long period of time" through December 26, 2000. Id. On the Physical Capacities form, Dr. Sisto noted that Keough could sit or walk for up to four hours and stand for up to three hours of an eight-hour workday, but that she should not do any pushing or pulling and should limit reaching above the shoulder level to one hour per workday. Id. at 113. Finally, Dr. Sisto indicated that although Keough could start work as early as December 8, 2000, she could not perform any "heavy lifting" until after December 26, 2000.[3] Id. On December 7, 2000, however, a physician's assistant from Dr. Sisto's office reported to Liberty Life that he would like Keough to "hold off on [her return to work] until 1/1/01." Id. at 47.

Keough in fact saw Dr. Jacuch in his office on December 7, 2000, as planned. Id. at 145. In his progress notes from this visit, he indicated that although she was experiencing "some

_____

    [3] Keough apparently told Liberty Life that she had seen Robert Helm. M.D., of Coastal Cardiothoracic Associates on November 21, 2000 who reportedly thought that a return to work date of December 8, 2000 "might be right on target." Admin R. 46.

chestwall tenderness" and "some fatigability," she was nevertheless "recuperating nicely." Id. Dr. Jacuch's notes make no mention of a return to work date. On December 6, 2000, however, based on "updated medical information" suggesting that Keough would be able to return to work on January 8, 2001, Liberty Life notified her that it had extended her STD benefits through January 7, 2001. Id. at 116.

On December 29, 2000, Keough returned to Wentworth-Douglass Hospital complaining of a urinary tract infection. Id. at 143. Thereafter, on January 4, 2001, she was seen for the first time by her primary care physician, Gloria Trujillo, M.D., of Dover Family Practice, for treatment of this infection. Id. at 135. Keough reported to Dr. Trujillo that "her energy is doing well," and that she "has had no chest pain, no shortness of breath, no pedal edema." Id. Following this examination, Dr. Trujillo referred Keough to cardiac rehabilitation. Id. at 136.

Keough returned to work on January 8, 2001, without Dr. Trujillo's knowledge or permission, but after only 2.5 hours she experienced extreme fatigue. Id. at 133. In the short time Keough was at work that day, she was notified that her position had been eliminated for budgetary reasons. Id. Keough was

surprised by this news, and reported that when she was being told, she had some "minor pain," felt "very stressed and anxious, and developed some tightness in her chest." Id. Later that day, Keough left work and went to Dr. Trujillo's office. Id. By the time she arrived, the pain in her chest had subsided, but Keough informed Dr. Trujillo that several days earlier she had experienced intermittent bilateral leg pain as well as muscle fatigue since her discharge from the hospital. Id. In her office notes, Dr. Trujillo indicated that anemia was likely contributing to Keough's fatigue and opined that she needed to start cardiac rehabilitation before she could "endure long levels of daily work." Id. at 134. Dr. Trujillo thus concluded that Keough was "not discharged to work" and gave her a note "to be on leave 4 more weeks." Id.

Keough next saw Dr. Trujillo on January 23, 2001. Id. at 131. This visit was scheduled as a follow-up to evaluate Keough's urinary tract infection, coronary artery disease, iron deficiency anemia, hypothyroidism, and gastoresophogal reflux disease ("GERD"). Id. In her office notes, Dr. Trujillo reported that:

[Keough] feels in talking with me and Dr. Cunningham

-8-

that she is really unable to return to work. She brings in with her a five page summary of the stress at Liberty Mutual that she has incurred. She has been employed there for approximately 32 years. She reports that even that several hours of working with incredible stress [sic] and reports and fells [sic] that her heart attack was related to the multiple stressful integrated issues at Liberty Mutual in her current position. She wishes to apply for disability. The [sic] reports no chest pain, no shortness of breath, no pedal edema. She reports incredible fatigue and with any stress she gets very anxious related to that stress. She reports no palpitations. She will be following up with Dr. Cunningham as noted above.[4]

Id. After this office visit, Dr. Trujillo gave Keough a note for her to remain out of work from February 6, 2001 through March 1, 2001. Id. at 132. Dr. Trujillo also advised Keough that she would need to involve her cardiologist in her disability claim. Id.

Nevertheless, on January 31, 2001, Dr. Trujillo completed Liberty Life's Restrictions form and Physical Capacities form in support of Keough's disability claim. Id. at 129-30. On the Physical Capacities form, Dr. Trujillo indicated that Keough could sit for fewer than four hours, stand for less than one

---

[4] Dr. Trujillo's reference to Dr. Cunningham may have been in error, as the record indicates that Keough was being treated by Dr. Jacuch, not Dr. Cunningham.

hour, walk for about two hours, and could lift 10 pounds or less three to four times per day, all with breaks. Id. at 129. Notwithstanding these assessments, Dr. Trujillo indicated that she did not feel Keough "will ever be able to physically endure [an] 8 hour work day," due to her significant coronary artery disease. Id. Similarly, on the Restrictions form, Dr. Trujillo noted that although Keough's "surgery was successful," the "significant extent" of her coronary artery disease prevented her from performing any "intense, stressful job." Id. at 130. Dr. Trujillo also noted that Keough's return to work date was "unknown." Id. Based on this updated medical information, Keough's STD benefits were further extended, through March 1, 2001. Id. at 158.

On February 6, 2001, Keough underwent a stress test. Id. at 182. She could not, however, complete the test because she developed bilateral intermittent claudication.[5] Id. When she saw Dr. Trujillo for a follow-up visit on February 27, 2001,

---

[5] Intermittent claudication is a condition caused by ischemia, or insufficient blood flow, of the muscles due to sclerosis with narrowing of the arteries, and is characterized by attacks of lameness and pain, brought on by walking, and chiefly occurring in the calf muscles. *Stedman's Medical Dictionary* 314 (25th ed. 1990).

Keough reported her calf pain and Dr. Trujillo recommended that she be tested for arterial occlusion, given her "significant" peripheral vascular disease.[6] Id. at 184. Dr. Trujillo noted, however, that Keough was in her second week of cardiac rehabilitation and slowly improving her endurance, and that she reported no significant shortness of breath, or chest pain. Id.

Keough next saw Dr. Jacuch on March 8, 2001. In his notes from this visit, Dr. Jacuch reported that

> [Keough] tells me that she has been feeling relatively well. The issue of anemia has been addressed, and [she] has had evaluation of peripheral vascular disease because of calf claudication. Since starting cardiac rehab, she has been doing well and expanding her exercise tolerance and her capacity for exercise with significantly diminished claudication. She plans to go to The Works [a health club] after she finishes her cardiac rehab. She has lost 15 pounds in one month, feels fantastic about the fact that her exercise tolerance is improving, continues to have no symptoms of chest pain, dyspnea [shortness of breath] on exertion, PND [paroxysmal nocturnal dyspnea], orthopnea [discomfort in breathing], palpitations, syncope [fainting] or edema.

Id. at 191.

---

[6] An arterial occlusion is the blockage of an artery due to the build-up of plaque on the arterial walls, leading to ischemia. See Stedman's Medical Dictionary 129, 1077(25th ed. 1990).

On the same day, Keough met with a vascular surgeon, Dr. Robert Oram, M.D. He diagnosed her with severe atherosclerotic disease with bilateral SFA occlusions and evidence of a right popliteal aneurysm.[7] Id. at 190.

On April 2, 2001, Liberty Life notified Keough that based on the updated medical information it had received on March 21, 2001, her STD benefits had been extended through April 17, 2001, the end of the maximum allowable STD period. Id. at 196.

## C. **Keough's Claim for Long Term Disability Benefits**

### 1. *The "Own Occupation" Period*

Pursuant to the Plan, Keough would be considered "disabled," and thus eligible to collect LTD benefits during the first 18 month period if, due to an injury or sickness, she was unable to perform all the material and substantial duties of her own occupation as an Associate Business Analyst. See Admin. R. 6, 31. To evaluate Keough's LTD claim, Liberty Life asked Liberty

---

[7] On April 17, 2001, Keough underwent an abdominal aortogram and aortofemoral run-off arteriogram at Wentworth Douglass Hospital. Admin. R. 217. These tests revealed "[e]xtensive arteriosclerotic disease involving the aortoiliac vessels, femoral and popliteal vessels" as well as a "total occlusion of both superficial femoral arteries with fill of only short segments of the popliteal arteries" and "[a]rteriovenous fistula involving her right foot." Id.

Mutual to submit her job description and a Physical Job Evaluation form. Id. at 207-09. According to Liberty Mutual's description, an Associate Business Analyst would be expected to be sitting for 100% of the time and typing between 25% and 50% of the time. Id. at 209. As Liberty Mutual explained, this is a sedentary job that did not require any physical exertion or lifting. Id. Additionally, Liberty Mutual claimed that this job would allow Keough to change positions frequently. Id.

On May 21, 2001, Dr. Trujillo forwarded to Liberty Life the results of Keough's April 17, 2001 tests, indicating that she had severe vascular disease of her lower extremities. Id. at 214. She explained that as a result of this condition, Keough could not sit, stand, or walk for more than 20 minutes at a time, and would need frequent breaks. Id. Dr. Trujillo reported that Keough had been referred to Dr. Oram for further management of her vascular disease. Id.

Several weeks later, Liberty Life asked Dr. Chester Conrad, M.D., a specialist in internal medicine and cardiovascular disease, to provide a peer review of Keough's file.[8] Id. at 219-

_____

[8] Dr. Conrad was asked five specific questions: (1) Based on the job description provided, can Ms. Keough return to work at

24. Dr. Conrad reviewed the entire file and also discussed Keough's case with Dr. Trujillo. Id. at 223. Dr. Trujillo explained to Dr. Conrad that although Keough had done reasonably well following her bypass surgery, from a cardiac standpoint, the severe claudication significantly limited her ability to undertake cardiac rehabilitation. Id. Dr. Trujillo further explained that Keough would be unable to work effectively, even at a sedentary job, until her peripheral vascular disease was treated, but might be able to return to work if her vascular problems were resolved. Id. Dr. Conrad thus found that there was no evidence of "post-operative ischemia, congestive heart failure, arrythmias, or other factors" that would preclude sedentary work from a cardiac standpoint. Id. Based on his review of the medical records, and his conversation with Dr. Trujillo, Dr. Conrad answered the five questions as follows:

---

this time? Regardless of your position please explain your reasoning; (2) If not, when do you anticipate she will be re-employable to her own occupation?; (3) What treatment, if any, do you feel [] is medically necessary and/or beneficial to help facilitate her return to work possibilities? Please outline specific modalities, frequencies and total duration of expected care; (4) When do you anticipate Ms. Keough may reach a level where she can seek some gainful employment?; (5) Do you consider Ms. Keough totally disabled from employment at this time? Admin. R. 219.

1. Based solely on the job description, it appears that [Keough] might theoretically be able to return to work, but the attending physician indicates that the employee has severe claudication and markedly impaired functional capacity, which would likely prevent her from being able to work at the present time.

2. It is quite possible that the employee could return to the job as described if her peripheral vascular disease can be effectively treated.

3. Evaluation and treatment for peripheral vascular disease (possibly including surgery) would likely be useful in improving the employee's functional capacity and allowing more effective rehabilitation. The attending physician indicates that the employee is to be seen by a vascular surgeon in the near future; if surgery is required, it is likely that a period of several months would be required for recovery and rehabilitation following surgery, although a precise period of time cannot be determined at present.

4. It is likely that the employee would be able to return to employment following treatment of peripheral vascular disease.

5. On the basis of the information provided by the attending physician, it appears that the employee is unable to return to work at the present time.

Id. at 219-20. Accordingly, by letter dated June 15, 2001, Liberty Life notified Keough that her claim for LTD benefits during the "own occupation" period had been approved, retroactive to April 18, 2001. Id. at 225-27. In this letter, Liberty Life also asked Keough to complete a Training-Education-Experience

-15-

form and a Social Security Payment Option form by July 16, 2001.[9]
<u>Id.</u> at 227. Keough timely complied with this request. <u>Id.</u> at
232.

    2. *The "Any Occupation" Period*

Under the Plan, the own occupation period of Keough's LTD
benefits was due to conclude on October 17, 2002. Admin. R. 256.
Keough would remain eligible for LTD benefits beyond this date
only if she was disabled, such that she was "unable to perform
all of the material and substantial duties" of her own occupation
or of "any other occupation" for which she was "reasonably fitted
by training, education, experience, age and physical and mental
capacity." <u>Id.</u> 6, 31. Accordingly, on May 13, 2002, Liberty
Life asked Keough to complete a Claimant's Information form, a
Claimant's Supplementary Statement, and an Activities
Questionnaire by June 3, 2002, and further requested updated
information from Keough's physicians. <u>Id.</u> at 241. Keough
completed these forms and returned them to Liberty Life on May
17, 2002. <u>See id.</u> at 242-46.

---

    [9] Keough was notified on July 3, 2001 that she was entitled
to monthly Social Security disability benefits. Admin. R. 234-
37.

On the Activities Questionnaire, Keough reported that she was able to perform most activities of daily living, including shopping, housework, running errands, and participating in an exercise program. Id. at 244-46. In addition, she reported that she spends approximately 12 hours per day sitting, albeit with a lot of stretching, and that she spends about one hour each day standing, usually in 10 minute intervals. Id. at 245. In the section of the Questionnaire that asked her to describe her typical day, Keough explained that in the morning she spends about one hour using her computer to manage her finances and correspond with friends and family, and in the evening spends between 3 and 3.5 hours reading the paper and sorting through her mail, before returning to her computer for additional correspondences and, occasionally, to play computer games. Id. at 246.

As requested by Liberty Life, Dr. Trujillo, Keough submitted updated medical information in July 2002, including office notes, a Restrictions form and a Functional Capacities form. Id. at 258-268. In her office note from January 2, 2002, Dr. Trujillo indicated that Keough was "doing very well" after bypass surgery for a blocked artery in her left leg, and that she was

-17-

"ambulating more," and is "pain free with ambulation and exercise." Id. at 261. In fact, Keough was "walking without any pain" and was exercising again at the gym. Id. Moreover, according to Dr. Trujillo, Keough had recently seen Dr. Oram and he too was pleased with her progress. Id. Finally, Dr. Trujillo noted that Keough had no chest pain or shortness of breath, that her energy level was good, and that she generally felt "great" and was exercising regularly. Id.

Keough was also seen by Dr. Trujillo for a physical examination on June 3, 2002. Id. at 265-68. Dr. Trujillo again reported that Keough "was still exercising regularly," had increased energy as a result of her thyroid medication and no pain from walking. Id. at 265. Then, on July 21, 2002, Dr. Trujillo indicated on a Functional Capacities form that Keough had no restrictions on her ability to drive or engage in repetitive motions, but that she could not bend, squat, kneel, climb, push, or pull. Id. at 260. On the same form, Dr. Trujillo opined that Keough could "never" return to work, and could only sit for about 4 hours each day (up to 1/3 of the time) and stand and walk for about one hour each day. Id. at 260. Likewise, on the Restrictions form she completed the same day,

-18-

Dr. Trujillo noted that Keough's estimated return to work date was "none."  Id. at 259.

In August 2002, Dr. Oram, who was treating Keough for her peripheral vascular disease, responded to Liberty Life's request and submitted treatment records, but did not complete the Restrictions form or the Functional Capacities form.  Id. at 270-85.  In his notes, Dr. Oram indicated that he had seen Keough in June 2001, and at that visit discussed her atherosclerotic disease at length.  Id. at 273.  Dr. Oram reviewed Keough's April 17, 2001 angiogram with her, explained the various treatment options, and recommended that she try to walk as much as possible.  Id.  When Dr. Oram saw Keough again, on August 27, 2001, they discussed bypass surgery on her left leg, but she elected to delay the surgery until October 2001.  Id. at 274.  Finally, on October 23, 2001, Dr. Oram performed a "left peroneal in situ bypass graft" on Keough's left leg.[10]  Id. at 278.  In a

_____

[10]  A peroneal in situ bypass graft is a surgical procedure performed on the lateral side of the lower leg by first removing a portion of a healthy blood vessel from the leg, called a graft, and then sewing or "grafting" one end of the healthy blood vessel to the artery above the blocked area and the other end to the artery below the blocked area.  The goal of this procedure is to increase blood flow to the lower leg and foot.  See Stedman's Medical Dictionary 224, 788 (25th ed. 1990).

-19-

November 19, 2001 post-operative visit to Dr. Oram's office, Keough reported that she was walking much better than she had been two weeks earlier and, moreover, had no complaints about her right leg. Id. at 282. More than six months later, on July 8, 2002, Brian Fisher, P.A.C., a physician's assistant in Dr. Oram's office, saw Keough for a follow-up visit. Id. at 285. At that appointment, Keough told Fisher that she was "doing a lot of walking," and going to "The Works, doing 2 to 2.5 mph for 25 minutes," only stopping because she wanted to go on to other machines. Id. Keough had "no complaints of claudication." Id. In his assessment, Fisher noted that Keough's left leg had an "improved status" and that her right leg was "stable." Id. He encouraged her to continue walking and told her that they would see her again in one year. Id. Dr. Oram agreed with this assessment and treatment plan. Id.

Liberty Life also received records from Keough's cardiologist, Dr. Jacuch. Id. at 287-91. According to a January 31, 2002 office note, Dr. Jacuch indicated that Keough looked and felt well, and she told him that she was exercising "every other day." Id. at 290. At that time, Keough denied any chest pain and had "improvement in her previous symptoms of leg claudication

as she underwent her bypass procedure in the lower left extremity" in October 2001.  Id.  On the Functional Capacities form dated August 27, 2002, Dr. Jacuch indicated that Keough could sit frequently (between 1/3 and 2/3 of the time), and stand, walk, squat, bend, kneel, climb, and drive occasionally (up to 1/3 of the time), but had no restrictions on repetitive motions or lifting less than 10 pounds.  Id. at 288.  Similarly, on the Restrictions form he indicated that Keough was "cardiac stable," but deferred to Dr. Oram as to her estimated return to work date.  Id. at 289.

On September 10, 2002, after collecting updated medical records, an independent registered nurse, Marilee Clark, R.N., reviewed Keough's file for Liberty Life to determine if she was disabled from her own or any occupation.  Id. at 286.  Clark found that although Keough had progressed well, and was cardiac stable, it would be necessary for Dr. Oram to address Keough's restrictions and limitations impacting her return to work, or order a functional capacities exam to determine her actual work capacity.  Id.  Clark then opined that she "would question [whether Keough would be] able to sustain a totally sedentary position due to the need for her to be up and about to promote

circulation." Id.

Liberty Life then referred Keough's case to a vocational counselor for a transferable skills analysis ("TSA") and a labor market survey ("LMS"). Id. at 292-97. The vocational counselor contacted Dr. Oram, provided him with Dr. Jacuch's August 27, 2002 Functional Capacities form, and asked him if he agreed with Dr. Jacuch's assessment. Id. at 297. She expressly requested that Dr. Oram respond and provide objective medical documentation by October 2, 2002 if he did not agree with Dr. Jacuch, and informed him that his failure to respond by this date would be construed as agreement with Dr. Jacuch. Id. Dr. Oram did not respond to this request and Liberty Life thus assumed he concurred with Dr. Jacuch's assessment.

On October 16, 2002, Liberty Life wrote to Keough to inform her that based on a review of the medical and vocational evidence submitted through September 2002, she no longer met the definition of "Total Disability" because, at that time, based on her education, work history, and transferable skills, there were three occupations Keough would be able to perform. Id. at 301-05. Liberty Life thus terminated her LTD benefits. Id. at 301. In support of its decision, Liberty Life cited to documentation

-22-

received from Dr. Trujillo, Dr, Jacuch, and Dr. Oram, as well as Keough's May 17, 2002 Activities Questionnaire and the findings of the vocational counselor. Specifically, Liberty Life found that Dr. Trujillo's office records from January 2002 through July 2002 were "inconsistent with the limitations she has placed on [Keough's] physical abilities" and indicated that it was "unclear how she arrived at these conclusions." Id. at 302. With respect to the documentation provided by Dr. Oram on August 21, 2002, Liberty Life found that Dr. Oram did not complete the Restrictions or Functional Capacities forms that were sent to him, and did not otherwise indicate any restrictions or limitations on Keough's functional abilities. Id. at 302-03. Moreover, a July 8, 2002 office visit note from Brian Fisher, a physician's assistant in Dr. Oram's office, indicated that Keough's left leg had improved after the surgery, her right leg was stable, and that he encouraged her to continue walking. Id. at 302. Fisher and Dr. Oram agreed that they would see Keough in one year. Id. In his August 27, 2002 assessment, Dr. Jacuch indicated that Keough had no restrictions on repetitive movements of her wrist, elbow, shoulder, or ankle, and no restrictions on lifting less than 10 lbs. Id. at 303. He further indicated that

-23-

she could frequently sit, push, reach, grasp, and lift between 10 and 20 pounds.  Id.

Liberty Life found that based on her May 17, 2002 Activities Questionnaire, Keough was able to perform her daily activities, including housework, shopping, running errands, and participating in a regular exercise program.  Id.  Finally, Liberty Life referred Keough's claim to a vocational counselor.  The counselor performed a Transferable Skills Analysis ("TSA") and a Labor Market Survey.  Based on her analysis of Keough's medical information and her education, work history, and transferable skills, she concluded that Keough was qualified to work as a Computer Support Specialist, a Management/Data Communications Analyst, and an Internal Auditor/Accountant.  Id. at 304.  Liberty Life thus determined that Keough did not meet the definition of "Disability" from any occupation as defined in the Plan.  As a result, her LTD benefits were terminated as of October 17, 2002.

D.   **Keough's Appeal**

By letter dated November 21, 2002, Keough appealed Liberty Life's decision to terminate her LTD benefits.  Admin R. 306-15.  With her 10-page appeal letter, Keough forwarded additional

medical documentation.[11]  In her letter, Keough thoroughly documented her subjective feelings of pain and attempted to clarify and explain the statements of her physicians contained in the medical records.  See id. at 306.  She also indicated that she suffered from physical and mental fatigue and an inability to concentrate.  See id. at 307.  Keough noted that she had recently suffered a knee injury and had aggravated a prior injury in her "upper right arm muscle" and a "right wrist and thumb" injury from writing and typing her "appeal document."  Id. at 306.  Finally, she reported that she suffered a "new strain injury to the trapezoidal muscle in [her] shoulder blade."  Id.

Keough also indicated in her appeal letter that in July

---

[11]  These materials included (i) the office notes from her October 24, 2002 visit with Dr. Trujillo; (ii) an October 29, 2002 letter of support from Dr. Trujillo; (iii) a November 11, 2002 letter of support from Dr. Oram; (iv) the records from her October 16, 2002 visit to the Wentworth Douglass Hospital emergency room for pain in her right knee; (v) the results of her October 23, 2002 stress test (along with her own summary of that test, titled "What Really Happened");(vi) the records from her four 2001 visits with Dr. Mitchell Kalter, who diagnosed her with and treated her for deQuervain's tenosynovitis; (vii) notes from her occupational therapists from sessions for treatment of deQuervain's in July and August 2001; (viii) Emergency Room Visit summary reports for several bladder infections; and (ix) notes from urologist Dr. Roger Evans who treated Keough for her bladder infections.

2001, Dr. Trujillo referred her to Dr. Mitchell Kalter because she had been experiencing pain in her right hand for two months. Id. at 334. Dr. Kalter diagnosed Keough with deQuervain's tenosynvitis in her right wrist.[12] Id. He treated her with corticosteriod injections and recommended a splint, occupational therapy, and rehabilitation. Id. Dr. Kalter saw Keough again in August 2001 and noted that she was "significantly improved with conservative management," and by September 2001, the triggering in her thumb was no longer bothering her. Id. at 335-36. Finally, in October 2001 Dr. Kalter reported that Keough was " so minimally symptomatic," that the deQuervain's was "essentially resolved." Id. at 337.

Liberty Life then referred Keough's appeal to Dr. John Holbrook, M.D., a physician board certified in internal medicine, for an independent evaluation. Id. at 375-82. He reviewed Keough's entire file, which included the new documentation submitted with her appeal. Specifically, Dr. Holbrook determined that as of August, 2002, Keough's cardiologist, Dr. Jacuch opined

---

[12] "DeQuervain's tenosynovitis," also called "deQuervain's disease," is fibrosis of the sheath of a tendon of the thumb. Steadman's Medical Dictionary 446 (25th ed. 1990).

that she "possesses significant retained physical functional capacity" and was able to "sit, push, grasp, lift 10 to 20 pounds on a frequent basis" as well as "walk, squat, bend, kneel, climb, drive, and pull on an occasional basis." Id. at 376. Noting that Dr. Jacuch's opinions were supported by the results of cardiac testing, Dr. Holbrook determined that there was "no evidence that Keough's physical functional capacity is limited by cardiac symptoms precluding sedentary activity." Id. Likewise, Dr. Holbrook found that Keough's hypercholesterolemia and hypothyroidism had been adequately treated and there was no evidence in the medical file that either of these conditions would cause an impairment precluding sedentary work. Id.

Dr. Holbrook next noted that in his November 11, 2002 letter, Dr. Oram indicated that Keough's peripheral vascular disease was not a "major difficulty" for her and that her file included multiple descriptions of her activity that depict a physical functional capacity that surpasses sedentary. Id. He further noted that Keough's own description of her ability to vacuum and clean bathrooms suggested a capacity to perform, at the very least, sedentary work. Id.

After acknowledging Keough's own description of severe

limitations in her activities based on fatigue and pain from her multiple diagnoses, Dr. Holbrook noted that "other independent observations and reports of her physical functional capacity and ability to sit and walk contradict [Keough's] self-reported limitations." Id. at 377. This, he determined, suggested a "significant degree of symptom magnification." Id. Furthermore, Dr. Holbrook found that Dr. Trujillo's reports of Keough's physical functional capacity were inconsistent with her own description from several months earlier, yet the file contained "no interval description of [Keough's] condition worsening." Id.

Next, Dr. Holbrook determined that there was evidence in the record that Keough had never mentioned her inability to concentrate to any of her physicians, nor had they ever recognized this problem or included it in their diagnostic lists. Id. Finally, Dr. Holbrook found that Keough had been successfully treated for deQuervain's tenosynovitis by Dr. Kalter in 2001, and that this condition did not appear again as an issue until October 2002. Id. He opined that if the problem had been severe, Keough would have been referred back to Dr. Kalter or to another orthopedic surgeon. Id. He thus concluded that Keough's problem with deQuervain's tenosynovitis was time-limited and

successfully treated, and did not rise to the level of causing impairment from sedentary work.  <u>Id.</u>

On the basis of his evaluation of Keough's medical file, Dr. Holbrook made the following recommendations:

1.  The diagnoses of coronary artery disease, hypothyroidism, carotid atherosclerosis, and peripheral vascular disease are certain.  The diagnosis of GERD is uncertain.

2. [Keough's] medical care appears to meet all the standards of good medical care.

3.  The preponderance of the evidence in the medical file indicates that [Keough] has recovered from coronary artery disease, hypothyroidism, and peripheral vascular disease on the basis of recent medical and/or surgical treatment such that she has adequate physical functional capacity for full time sedentary work.

4.  There is no indication in the medical file that GERD or carotid disease ever produced symptoms that limited [Keough's] physical functional capacity.

5.  There in no indication in the medical file that [Keough] has other diseases that significantly limit her physical functional capacity to a degree that would limit her ability to perform full-time sedentary work.

<u>Id.</u> at 375.

On March 6, 2003, after considering the additional evidence submitted with Keough's appeal and Dr. Holbrook's assessment and recommendations, Liberty Life upheld its October 16, 2002 decision to terminate her LTD benefits.  <u>Id.</u> at 387.  Liberty

Life concluded that "the totality of medical and vocational documentation reviewed does not substantiate that Ms. Keough is disabled from performing other occupations within her vocational capacity." Id. In this letter, Liberty Life first detailed the relevant Plan provisions and provided a complete history of Keough's case, including the TSA and labor market survey conducted by the vocational counselor, as well as Dr. Holbrook's findings. See id. at 388-92. It then explained that despite Keough's reports of pain and fatigue, the medical and clinical evidence in her file did not establish that any of her conditions are of the "nature and severity which would prevent her from performing the sedentary alternative occupations" identified by the vocational consultant. Id. at 393. Notably, Liberty Life pointed out that each of these occupations would allow Keough to change positions throughout the day, as needed. Id. Her administrative rights to review exhausted, Keough commenced this suit.

## STANDARD OF REVIEW

The parties' initial dispute is over the appropriate standard of review. When the denial of benefits is challenged

under ERISA, § 1132(a)(1)(B), "the standard of review depends largely upon whether 'the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" Leahy v. Raytheon Co., 315 F.3d 11, 15 (1st Cir. 2002)(quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)). If the benefit plan clearly grants the plan administrator discretionary authority, a deferential "arbitrary and capricious" or "abuse of discretion" standard of review is mandated.[13] See id.; see also Terry v. Bayer Corp., 145 F.3d 28, 37 (1st Cir. 1998). This standard means that "the administrator's decision will be upheld if it is reasoned and supported by substantial evidence in the record." Vlass v. Raytheon Employees Disability Tr., 244 F.3d 27, 30 (2001)(internal quotations omitted); see also Cook, 320 F.3d at 19 (in determining if a plan administrator's decision was reasonable, the court looks to the record as a whole: that evidence that was before the administrator when he made the decision being reviewed). As such, "[r]easoned denials of

_____

[13] In the First Circuit, there is no substantive difference between "arbitrary and capricious" and "abuse of discretion" review in the ERISA context. Cook v. Liberty Life Assurance Co. of Boston, 320 F.3d 11, 17 n.7 (1st Cir. 2003).

-31-

benefits that are supported by substantial evidence will survive review under this standard." Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998). Substantial evidence means evidence that is "reasonably sufficient to support a conclusion," and the presence of contradictory evidence "does not, in itself, make the administrator's decision arbitrary." Vlass, 244 F.3d at 30. Finally, in reviewing a decision to terminate benefits, "a court is not to substitute its judgment for that of the [decision-maker]." Terry, 145 F.3d at 40 (internal quotations omitted).

Keough concedes, as she must, that the Plan Administrator, Liberty Life, is vested with the discretionary authority to construe the terms of the Plan and to make benefits determinations.[14] Keough argues, however, that I must apply a heightened standard of review because Liberty Life operated under a conflict of interest. She asserts that a "glaring conflict of interest clearly exists" because her employer, Liberty Mutual, the Plan's sponsor and the entity that paid for her disability

---

[14] In fact, the clear and express grant discretionary authority appears in both the Plan, see Admin. R. at 23, and in the supporting Summary Plan Description. See Admin. R. at 39.

benefits, is affiliated with Liberty Life, the Plan's underwriter and administrator. I disagree. The First Circuit has instructed that "[t]o affect the standard of review, . . . a conflict of interest must be real. A chimerical, imagined or conjectural conflict will not strip the [plan administrator's] determination of the deference that would otherwise be due." Leahy, 315 F.3d at 16 (citing Doyle, 144 F.3d at 184). It is no more than mere conjecture to allege that a conflict exists "simply because an award of benefits would come from the same entity that is responsible for determining eligibility for those benefits." Robinson v. Unum Life Ins. Co. of Am., No. Civ. 02-6-B, 2003 WL 1193017, at *5 (D.N.H. Mar. 12, 2003); see also Smith v. Fortis Benefits Ins. Co., No. Civ. 02-55-B, 2003 WL 1049959, at *4 (D.N.H. Mar. 6, 2003)(finding no actual conflict where insurer served both as plan administrator deciding claims and employer paying out claims). Without more, this general assumption does not support Keough's conclusion that Liberty Life was improperly motivated.

Here, the only other evidence that Keough has produced to bolster her theory that Liberty Life was improperly motivated when it terminated her LTD benefits is unpersuasive. Keough

-33-

argues initially that because this Plan was employer, rather than employee, funded, Liberty was "biased" in its handling of claims because it was "essentially paying out of pocket" for Keough's LTD benefits.  This argument is unavailing for two reasons.  First, in Doyle, the First Circuit recognized that although such an arrangement may suggest a conflict, it indicated that the problem is "not as serious as might appear at first blush."  144 F.3d 181, 184 (1st Cir. 1998).  The court explained that the existence of "an important competing motive:  having a benefit plan to please employees, not to result in the employer's bad reputation" operated as a countervailing motivation on Plan Administrators to review claims with an even hand.  Id.  Second, this Plan is not employer funded.  The full cost of long term disability coverage is paid by the employees with after-tax dollars.  See Admin. R. at 30.

Next, she relies heavily on the fact that her job was eliminated in January 2001 and on an email from Deneen DeCost at Liberty Life to Michael Bisson at Liberty Mutual, in which DeCost wrote that any effort to return Keough to her former position was

"fruitless" and that Liberty Mutual did not want her back.[15]  Id. at 200.  From this, Keough reasons that Liberty Life made the decision to terminate her benefits as soon as the initial 18-month benefit period concluded.  She also suggests that in evaluating her claim for LTD benefits in the "any occupation" period, Liberty Life failed to consider "alternative pieces of evidence" from her doctors and "conveniently ignored" her inability to sit for long periods of time.  Aside from these unsubstantiated allegations, however, Keough offers no evidence, documentary or testimonial, to support her theory.  This evidence is simply insufficient to demonstrate the existence of a conflict.  See Leahy, 315 F.3d at 16.

Finding no conflict of interest, I must apply an arbitrary and capricious standard of review, and proceed to ensure that the termination of LTD benefits was not "objectively unreasonable in

---

[15]  This excerpt of the email tells only part of the story. First, DeCost wrote to Bisson that because Keough's job had been eliminated, "any effort to return her to her former position is fruitless, and "from what I gather from both parties, [Keough] would never go back and [Liberty Mutual does not] want her back." Admin R. at 200.  In his response to DeCost's email, Bisson wrote that even though Keough would not be returning to her job at Liberty Mutual, "we still need to evaluate her disability based on being disabled from her prior job to her disability for the own occupation period."  Id.

light of the available evidence." <u>Pari-Fasano v. ITT Hartford Life and Accident Ins. Co.</u>, 230 F.3d 415, 419 (1st Cir. 2000).  I hold that it was not.

## ANALYSIS

Keough claims that Liberty Life's determination that she no longer met the definition of "Total Disabiity," and its subsequent termination of her LTD benefits was "arbitrary and capricious."  Pl.'s Mot. for Summ. J. at 14.  (Doc. No. 13).  In support of her position, Keough makes two arguments.  First, she asserts that because there were no material changes in her health status, either before or after Liberty Life terminated her benefits, the decision to terminate was necessarily "arbitrary and capricious."  <u>Id.</u> at 14-17.  Second, she argues that Liberty Life did not have sufficient evidence to make a reasonable eligibility determination because it did not consult all the information reasonably available to it.  <u>Id.</u> at 17-19.

To support her first argument, Keough claims that Liberty Life disregarded Dr. Trujillo's and Dr. Oram's assessments that she could not return to work, likewise disregarded her subjective

account of her own medical problems, and failed to give controlling weight to the opinions of her treating physicians that supported her position on appeal. Keough charges that the available medical evidence was clear and uncontroverted, such that a reasonable review of this evidence could lead only to the conclusion that in October 2002, she remained "totally disabled" and unable to perform even sedentary work. This argument is unavailing.

Here, a careful review of the record reveals that it is neither clear nor uncontroverted. Rather, the record is capable of "supporting competing inferences" as to both the improvements in Keough's health status and her ability to return to work. Leahy, 315 F.3d at 19. Unfortunately for Keough, that conflict is insufficient to satisfy her burden. Id. Under an "arbitrary and capricious" standard of review, the essential question is not which side I believe is right, but whether Liberty Life had substantial evidentiary grounds to reasonably terminate Keough's disability benefits. See Matias-Corea v. Pfizer, Inc., 345 F.3d 7, 12 (1st Cir. 2003); Brigham v. Sun Life of Canada, 317 F.3d 72, 85 (1st Cir. 2003). I therefore reject Keough's position on this point.

An additional flaw in this argument, however, is that Liberty Life was not required to demonstrate a material change in her health immediately prior to the decision to terminate her benefits. Although Keough relies in part on Cook v. Liberty Life Assurance Co., 320 F.3d 11 (1st Cir. 2003) for support, this reliance is misplaced. Cook does not, as Keough seems to contend, stand for the proposition that a plan administrator's decision to terminate disability benefits is "arbitrary and capricious" when the available evidence does not demonstrate any material change in the participant's health. Rather, in Cook, the First Circuit concluded that the insurer's decision to terminate Cook's disability benefits was "arbitrary and capricious" because in so doing, it rejected the unwavering opinion of her treating physician that she was "totally disabled" and "should be kept out of work indefinitely" without developing "any contradictory medical evidence in the record to support its decision to reject Cook's evidence." Cook, 320 F.3d at 23. Cook is thus inapposite where, as here, the file is replete with contradictory medical evidence and reasonable medical professionals could, and did, disagree.

Keough's second argument, that Liberty Life did not have

sufficient information to reasonably deny her benefits, is equally unavailing. Here, Keough first claims that Liberty Life "summarily disregarded" her subjective descriptions of her own medical problems, including her inability to concentrate. This is an inaccurate description of Liberty Life's analysis. In his review of her file, Dr. Holbrook specifically considered how Keough described her own inability to concentrate, and recognized this testimonial as a potential complication of cardiac bypass surgery. He also noted, however, that there was no record that Keough had ever mentioned this problem to any of her physicians and that none of Keough's physicians ever recognized this problem or included it in their diagnostic lists. Finally, Dr. Holbrook pointed out that Keough's ability to describe her various medical conditions over many pages of typewritten text contradicted her description of this problem. Liberty Life did not, therefore "summarily disregard" her subjective claim of an impairment. Rather, Liberty Life reasonably accepted Dr. Holbrook's opinion that Keough's claim of a disabling inability to concentrate was not credible.

Keough next alleges that Liberty Life failed to give controlling weight to those opinions of her treating physicians

that supported her appeal and that it ignored Dr. Oram's November 11, 2002 letter. Again, Keough is incorrect. Faced with sharply conflicting medical evidence, Liberty Life reasonably accepted the opinions of the vocational counselor and Dr. Holbrook regarding her ability to return to work, rather than Keough's contrary view and the inconsistent opinions of her treating physicians.

Moreover, Dr. Oram's November 11, 2002 letter was in fact included in the medical records reviewed by Dr. Holbrook, and he made specific reference to the conclusions advanced by Dr. Oram in that letter.[16] In that letter Dr. Oram stated, somewhat inconsistently, that Keough had some "numbness after sitting in a chair for only five minutes" but that "the issue of vascular insufficiency" was not a "major difficulty" for her. He did not

---

[16] Liberty Life did not consider Dr. Oram's assessment during the initial "any occupation" eligibility determination because Dr. Oram failed to respond to at least one request for medical records. Specifically, when the vocational counselor contacted him on September 18, 2002, she provided him with Dr. Jacuch's assessment of Keough's physical functional capacity, asked him to provide his own impressions, and put him on notice that if she did not hear from him by October 2, 2002, Liberty Life would assume he concurred with Dr. Jacuch's assessment. Dr. Oram did not respond to this request, and Liberty Life thus proceeded on the assumption that he agreed with Dr. Jacuch.

indicate, however, whether he concurred with Dr. Jacuch's August 27, 2002 Functional Capacities form, but instead deferred to Dr. Trujillo's assessment of Keough's limitations.

Furthermore, the medical opinions offered by Dr. Trujillo and Dr. Oram were by no means conclusive. For example, on March 19, 2001, Dr. Trujillo indicated that Keough could sit for approximately four hours with breaks; in May 2001 she retreated from this assessment and reported that Keough could only sit for no more than twenty minutes at a time, but by July 21, 2002, Dr. Trujillo again opined that Keough could sit for up to 1/3 of the workday. Similarly, although there is no mention in Dr. Oram's records of Keough ever complaining about an inability to sit for more than a few minutes at a time, and in fact, a June 2001 report from his office indicated that she did not have "rest pain in either leg," in his November 11, 2002 letter Dr. Oram nevertheless inexplicably concluded that she could not sit for more than five minutes without experiencing numbness in her legs. This assessment was contradicted by Dr. Jacuch's August 27, 2002 Functional Capacities form in which he indicated that Keough could sit, push, reach, and grasp frequently (between 1/3 and 2/3 of the time), and could stand, walk, squat, bend, kneel, climb,

and drive occasionally (up to 1/3 of the time). Dr. Jacuch further indicated that by August 2002, Keough was cardiac stable. In view of this evidence, it was not unreasonable for Liberty Life to credit Dr. Jacuch and Dr. Holbrook's opinions and conclude that the medical conditions described in Keough's appeal letter did not prevent her from returning to work. See Leahy, 315 F.3d at 19 (observing that when medical evidence is sharply conflicted, the deference due to a plan administrator may be especially great).

Finally, as additional evidence that Liberty Life's decision to terminate her benefits was "arbitrary and capricious," Keough offers that neither the October 16, 2002 letter terminating her LTD benefits nor the March 6, 2003 letter upholding that decision mention that she was receiving Social Security benefits, which can be relevant to an insurer's disability determination. Although a determination of disability by the Social Security Administration can be relevant evidence, see Gannon v. Metropolitan Life Ins. Co., 360 F.3d 211, 215 (1st Cir. 2004), the mere fact of a Social Security disability award is not binding on insurers and "should not be given controlling weight except perhaps in the rare case in which the statutory criteria

are identical to the criteria set forth in the insurance plan." Pari-Fasano, 230 F.3d at 420.  Keough had not presented any evidence that hers is one of the rare cases in which the eligibility criteria for Social Security benefits is identical to the criteria outlined in the Plan.  See Matias-Correa, 345 F.3d at 12 (noting that claimant was required to satisfy the plan's definition of total disability rather than the Social Security Administration's definition).  Furthermore, although a related Social Security benefits decision may be of some value to a plan administrator's eligibility determination, particularly in cases in which the Administration makes specific findings, the award letter in Keough's case only provided information regarding the payment of benefits, but no information describing how the Administration reached its eligibility determination.  See Gannon, 360 F.3d at 215.  It was therefore not unreasonable for Liberty Life to reach a different conclusion regarding Keough's eligibility for disability benefits than the decision reached by the Social Security Administration.

As Plan Administrator, Liberty Life was authorized to weigh conflicting evidence and to determine the weight accorded to the opinions of Keough's physicians.  See Vlass, 244 F.3d at 32; see

also <u>Black & Decker Disability Plan v. Nord</u>, 528 U.S. 822, 834 (2003)(noting that courts may not require plan administrators to accord special deference to the opinions of an employee's treating physicians). Accordingly, Liberty Life was acting within its discretion when it relied on the opinion of Dr. Holbrook, even though he did not examine Keough and even though he based his opinion solely on a review of the file. <u>See</u> <u>Gannon</u>, 360 F.3d at 214-15; <u>Matias-Corea</u>, 345 F.3d at 12. It was also reasonable for Liberty Life to rely on the information Keough provided in her Activities questionnaire in which she indicated that she spends approximately 12 hours a day sitting, albeit with a lot of stretching. Keough's own description of her typical day is consistent with, and buttressed by, evaluations provided by Dr. Jacuch in August 2002, and not entirely inconsistent with some of the opinions provided by Dr. Oram and Dr. Trujillo. Given Liberty Life's authority under the Plan to use its discretion, it was for Liberty Life alone to determine exactly how to measure the relative strength of these contradictory opinions.

I therefore find that Liberty Life's determination that Keough was not "totally disabled" and its decision to terminate

her LTD benefits rests on substantial evidence and was an appropriate exercise of its discretion as Plan Administrator. See Gannon, 360 F.3d at 216; Leahy, 315 F.3d at 19.

## CONCLUSION

For all of the foregoing reasons I grant Liberty Life's motion for summary judgment (Doc. No. 9) and deny Keough's cross motion for summary judgment (Doc. No. 14). The clerk shall enter judgment accordingly.


SO ORDERED.


_____
Paul Barbadoro
District Judge


February 24, 2005

cc:  Eugene A. DiMariano, Esq.
     William D. Pandolph, Esq.